**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FRANCIS T. FOSTER,

       Plaintiff

  vs.

| | | |
|---|---|---|
| THEODORE M. BECKER | ) | |
| ANDREW C. PORTER | ) | |
| FAEGRE DRINKER BIDDLE & REATH LLP | ) | No. |
| MCDERMOTT WILL & EMERY LLP | ) | |
| PRINCIPAL LIFE INSURANCE COMPANY | ) | |

       Defendants

## COMPLAINT

**COME NOW** the Plaintiff, Francis T. Foster and complains of the Defendants as follows:

## THE PARTIES

1.    Plaintiff, Francis T. Foster (Foster) is a natural person, a citizen of the United States, resides in Brookfield, Illinois and is an attorney and officer of the court; he was the plaintiff and attorney in a lawsuit against Principal Life Insurance Company (Principal) in the United States District Court Northern District of Illinois, # 1:13-cv-03066; its first appeal to the Seventh Circuit Court of Appeals in *Foster v. Principal Life Ins. Co.*, 806 F. 3d 967 (7th Cir. 2015) [hereinafter referred to as Foster I]; its remand to the district court, its second appeal to the Seventh Circuit Court of Appeals in *Foster v. Principal Life Insurance Company*, 18-3215, Order, doc 25, July 22, 2019, [hereinafter referred to as Foster II], and in all subsequent proceedings.

2.    Defendant, Theodore M. Becker (Becker) is an attorney, officer of the court, and the individual attorney who represented Principal throughout all proceedings.

1

3.     Defendant, Andrew C. Porter (Porter) is an attorney, officer of the court, and the individual attorney who, on remand in the district court, signed the pleadings in Principal's cross motion for summary judgement.

4.     Defendant, Drinker Biddle & Reath (Drinker) is the law firm that represented Principal in the original district court judgement in favor of Principal, the appeal in Foster I, and the remand to the district court, and is now known as Faegre Drinker Biddle & Reath LLP.

5.     Defendant, McDermott Will & Emery (McDermott) is a law firm that represented Principal in the appeal in Foster II and in all subsequent proceedings.

6.     Defendant Principal Life Insurance Company (Principal) is a corporation incorporated in the State of Iowa and was the defendant in the above described lawsuit.

## NON PARTY OFFICERS OF THE COURT

7.     Rebecca R. Pallmeyer (Pallmeyer) is a district court judge, officer of the court, and the district court judge in Foster's lawsuit against Principal.

8.     Amy C. Barrett (Barrett) was a circuit judge in the Seventh Circuit Court of Appeals, is an officer of the court and member of the appellate panel in Foster II and all subsequent appellate proceedings, presently, Barrett is a judge on the Supreme Court of the United States.

9.     Michael B. Brennan (Brennan) is a circuit judge in the Seventh Circuit Court of Appeals, an officer of the court, and member of the appellate panel in Foster II and all subsequent appellate proceedings.

10.     Frank H. Easterbrook (Easterbrook) is a circuit judge in the Seventh Circuit Court of appeals, an officer of the court, and was a member of the appellate panel in Foster II and all subsequent appellate proceedings.

## OTHER NON PARTIES

11.     Pace Suburban Bus Division (Pace) is a municipal corporation and division of the Regional Transportation Authority that operates bus line divisions in northern Illinois and each division has its own collectively bargained retirement plan run by a plan committee composed of Pace appointed and Union appointed members whereby the Pace appointed members on each committee have one vote and the Union appointed members on each committee have one vote; accordingly, action by the Plan Committees requires a consensus (100% vote) to take any action (the 401k collectively bargained plans will often be referred to as "Pace Union 401k Plans").

12.     Darrell Washington (Washington) was the account manager on the Pace Union 401k Plans as an employee of ABN AMRO Trust Company until November 28, 2005 when he became the account manager on said plans as an employee of Principal.

13.     Joseph Ellyin (Ellyin), a Pace employee, was the sole Pace appointed Plan Committee member on the Pace Heritage Division 401k Plan, Pace River Division 401k Plan, Pace Southwest Division 401k Plan, and the Pace North Shore Division 401(k) Plan; he was also a Pace appointed Plan Committee Member on the Pace ATU Local 1028 401k Plan & Trust.

14.     Ellyin was a member of the above Plan Committees from 2001 until March 2011 when he was removed from all of the Plan Committees by Thomas J. Ross (Ross), the Executive Director of Pace.

15.     Mark Klafeta (Klafeta), a Pace employee, replaced Ellyin as the sole Pace appointed Plan Committee member on the Pace Heritage Division 401k Plan, Pace River Division 401k Plan, Pace Southwest Division 401k Plan, and the Pace North Shore Division 401(k) Plan.

16.     Cecil Crum (Crum) a Pace employee, replaced Ellyin on the Pace ATU Local 1028 401k Plan & Trust.

17.     Melinda Metzger (Metzger) a Pace employee (Deputy Executive Director of Pace) was a Pace Plan Committee member on the Pace ATU Local 1028 401k Plan & Trust.

18.     Brett Burkhardt (Burkhardt) a Pace employee (Group Division Manager) was a Pace Plan Committee member on the Pace ATU Local 1028 401k Plan & Trust.

19.     Pace, Ellyin, Klafeta, Metzger, Burkhardt and Ross were among the defendants in Foster's lawsuit filed on December 30, 2011 in the Northern District Court of Illinois, # 1:11-cv-09307, and parties to the confidential settlement agreement between Foster and Pace and the Pace employee defendants..

## JURISDICTION AND VENUE

20.     This court has subject matter jurisdiction to set aside a judgement of this court procured by fraud on the court: an action to set aside a judgement for fraud in obtaining the judgement constitutes an original and independent proceeding that is a new case arising upon new facts, although having a relation to the validity of an actual judgement.  *Johnson v. Waters* 111 U.S. 640, 668 (1884); Rule 60(d), Federal Rules of Civil Procedure.

21.     This court has subject matter jurisdiction over this conspiracy action under 42 U.S.C. § 1983; a federal judge sitting in a diversity suit is a state actor:

> Here we are dealing with a right to recover derived not from the United States but from one of the States.  When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic. But since a federal court adjudicating a State-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State.
> *Guaranty Trust Co. v. York*, 326 U.S. 99, 108-109 (1945).

22.     This court has subject matter jurisdiction over this conspiracy action as a "*Bivens*" action named after the Supreme Court Case establishing a cause of action against a federal

4

employee for violation of the Fourth Amendment. *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971); extended to violations of the Fifth Amendment. *Davis v. Passman,* 442 U.S. 228, 244 (1979).

23.     Venue lies in this court pursuant to 28 U.S.C. § 1391 where all the acts complained of occurred.

## FACTS

### Foster's Lawsuit against Pace

24.     Each Pace Union 401k Plan Committee by resolution in 2003 entered into a fixed fee monthly contract with Foster to perform legal services to the respective Pace Union 401k Plan.

25.     From 2003 to March 2011, Foster presented his monthly invoice to the record-keeper for the Pace Union 401k Plan Committees and those invoices were paid.

26.     Pace is the only contributing employer to the Pace West Division Plan which is an "affected pension plan" under the Illinois Pension Code:

> In the case of an affected pension plan that is under-funded on January 1, 2009 or becomes under-funded at any time after that date, the contributing employers shall contribute to the affected pension plan, in addition to all amounts otherwise required, amounts sufficient to bring the funding ratio of the affected pension plan up to 90% in accordance with an amortization schedule… 40 ILCS 5/22-103(c).

27.     On December 18, 2009, Foster notified Pace management employees Burkhardt and Metzger that the plan's actuaries determined that under the above Illinois Pension Code funding requirement, Pace would have to pay an additional contribution of $218,941 for the 2009 Plan Year.

28.     On February 17, 2010, the Pace West Division Plan Committee reduced the required contribution to $181,360 because the actual contributions exceeded the estimated

contributions used by the actuary and adopted a formal resolution which was delivered to Pace demanding that Pace pay the required contribution amount of $181,360 on or before June 30, 2010.

29.     At its December 9, 2010 meeting, the Pace West Division Plan Committee discussed Pace's failure to present the 2009 required additional contribution to the Pace Board of Directors to approve payment, and authorized Foster to notify each individual Pace Board Member of Pace's non-payment of the 2009 required additional contribution and also make a demand for payment of the required additional contribution for 2010.

30.     Foster notified each Member of Pace's Board of Directors in a letter dated January 6, 2011 that Pace was in violation of the Illinois Pension Code for its failure to make an additional contribution to the Pace West Division Plan of $181,360 for the 2009 year; Foster also made a demand for payment in the amount of $235,190, the amount determined by the Pace West Division Plan actuaries to be due for the 2010 plan year.

31.     Pace and Pace management employees subsequently retaliated against Foster by attempting to terminate Foster's representation as attorney for the Plan Committees by letter dated February 24, 2011 from Joseph Ellyin, a Pace employee, and a letter dated March 17, 2011 from Pace employee, Thomas Ciecko, Pace's General Counsel, but Pace lacked the authority to terminate Foster's representation as only the Plan Committees had authority to terminate Foster and they had not done so.

32.     In March 2011, T. J. Ross, Executive Director of Pace, removed all the Pace appointed plan committee members serving on the Pace collectively bargained plans, except Metzger and Burkhardt, and replaced them with Pace management employees.

33.     In retaliation against Foster for his reporting to the Pace Board of Directors, the newly appointed Pace management employees on the Pace West Division Plan terminated Foster

without a quorum present at a meeting in April, 2011 which caused the payment of Foster's monthly retainer fees on the Pace West Division Plan to stop after March 1, 2011.

34.     Pace, without authority, instructed Principal who was the record-keeper for the Pace Union 401k Plan Committees to stop paying Foster's monthly retainer fees after March 1, 2011 to retaliate against Foster for his reporting to the Pace Board of Directors;

35.     Principal complied with Pace's directions even though Principal was legally bound to take orders only from the Plan Committees.

36.     Foster filed a lawsuit against Pace and Pace employees T. J. Ross, Executive Director of Pace, Melinda Metzger, Deputy Executive Director of Pace, Thomas L. Ciecko, General Counsel of Pace, Brett Burkhardt, Joseph Ellyin and Mark Klafeta in the Northern District Court of Illinois on December 30, 2011.  Case # 1:11-cv-09307.

37.     Foster claimed relief under 42 U.S.C. 1983 for violation of Foster's first amendment right to free speech; relief under 42 U.S.C. 1981 as a whistleblower for a suspect class, (the Pace West Division Plan covered predominately black employee participants); intentional interference with prospective economic advantage and other theories of liability.

38.     For seventeen months (March 1, 2011 through July 31, 2012), Foster provided legal services to the Pace Union 401k Plans and the Pace West Plan to the extent permitted under the circumstances without payment of his monthly retainer fees.

39.     In order to survive economically, Foster settled the case in June 2012 before a U.S. Magistrate in accordance with an Alternate Dispute Resolution Procedure and entered into a confidential settlement agreement with Pace and the Pace employees.

7

**Foster I Appeal # 14-3203**

40.     Foster filed a lawsuit on April 23, 2013 against Principal Life Insurance Company (Principal) in the United States District Court Northern District of Illinois, # 1:13-cv-03066.

41.     Principal moved to dismiss Foster's complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

42.     On May 9, 2014, Pallmeyer, the district court judge granted Principal's Rule 12(b)(6) motion and dismissed Foster's complaint but did so because the court concluded that Foster's claim for tortious interference with prospective economic advantage against Principal was discharged pursuant to the terms of the confidential settlement agreement between Foster and Pace in an earlier lawsuit:

> The Pace litigation was resolved by a confidential settlement agreement. Whatever the terms of that settlement may be, it put to rest claims against Pace, its employees, and the RTA. As Plaintiff's claim against Principal is derivative of its already litigated claims against Pace, Plaintiff cannot re-litigate Pace's liability here by suing Principal. 13-cv-03066, doc 43, page 23.

43.     On appeal, Becker and Drinker made the following representation to the Seventh Circuit Court of Appeals:

> Principal disputes that it owes any amount to Foster, but acknowledges that the amount in controversy exceeds $75,000 exclusive of interest and costs. 14-3203, Principal's Docketing Statement, doc 14, p. 1-2, 10/21/14.

44.     The Foster I appellate court panel determined that there was diversity subject matter jurisdiction in the district court as Foster was a citizen of Illinois and Principal a citizen of Iowa and the amount in controversy exceeded $75,000 at the time the complaint was filed.

45.     The Seventh Circuit Court of Appeals on November 25, 2015 vacated the district court's judgement concluding that Foster stated a claim for intentional interference with

prospective advantage and that his claim against Principal is not precluded by his settlement with

Pace:

> Reading the Amended Complaint as a whole, accepting Foster's allegations as true and drawing all reasonable inferences in his favor, it is apparent that he alleged that Pace repeatedly *attempted* to terminate him but lacked the legal authority to do so. Pace then wrongfully directed Principal to stop paying Foster, again without legal authority to do so. And even though Pace lacked the legal authority to issue the stop – payment order, and even though Principal was legally bound to accept orders only from the Plan committees, Principal enacted Pace's unlawful directive and stopped paying Foster, an action that harmed Foster's attorney-client relationship with the Pace Plan committees. It is with that understanding of Foster's claims that we address the district court's determination that Foster's claim against Principal had been resolved by his prior litigation against Pace.

> On appeal, Foster contends that his claim against Principal was not derivative of his earlier claims against Pace. He notes that the district court cited no legal doctrine underlying its finding that the claim was barred as "derivative" and so he postulates various legal bases on which the court might have relied, such as res judicata and collateral estoppel. Foster maintains, and we agree, that the requirements of res judicata and collateral estoppel cannot be met under the facts presented here. Indeed, Principal does not attempt to defend the district court's rationale that the claim was "derivative" and conceded at oral argument that neither res judicata nor collateral estoppel apply in these circumstances. Nor is there any indication that Principal was somehow released by the terms of Foster's confidential settlement agreement with Pace and Pace employees in the earlier litigation.

> Foster also contends, and again we agree, that Principal's liability is not discharged under the Illinois Joint Tortfeasor Contribution Act ("Act"). See 740 ILCS 100/2… Principal does not assert that it was specifically named in a release in the Pace litigation. Thus Principal's liability is not discharged under the plain language of the Act. Principal's claim that the Act does not apply to intentional tortfeasors is belied both by the plain language of the Act and the Illinois Supreme Court's application of the provision in a case involving an intentional tortfeasor. *Thornton*, 340 Ill Dec. 557, 928 N.E.2d at 813-14. We therefore conclude that Foster has stated a claim for intentional interference with prospective economic advantage and that his claim is not precluded by his settlement with Pace and Pace employees.

> The judgement is vacated and the case remanded for further proceedings consistent with this opinion. [The above quoted excerpts are from Foster I, 806 F. 3d 973-974].

46.    Per direction from the Seventh Circuit Court of Appeals [Id at 974], Foster filed a

second amended complaint to eliminate the allegations against the other defendant who was not a

party to the appeal and clarify his allegations against Principal. Second Amended Complaint, doc 81, 1/7/16.

47.     Foster clarified his allegation "resulted in the destruction of his longstanding attorney client relationships" by adding an additional specific allegation in his Second Amended Complaint that each Plan Committee in or about August, 2012 passed a resolution terminating Foster's representation as plan attorney. Id. ¶ 37.

<b>Principal's Motion on Remand</b>

48.     Becker and Drinker made a motion to enter the third party settlement agreement between Foster and Pace into evidence. Motion, doc 88, 1/27/16.

49.     Foster immediately filed an objection asserting that Foster I is res judicata that the settlement agreement is not a defense to Foster's claim against Principal and the doctrine of res judicata applies to all matters raised or that could have been raised with respect to the settlement agreement defense. Objections, doc 90, 1/28/16.

50.     Foster further objected on the basis that Foster's settlement with Pace was reached in an Alternate Dispute Resolution Mediation Proceeding before a U.S. Magistrate under 28 U.S.C. 652(a) and Local Rule 83.5 implementing 28 U.S.C. 652(d) prohibits the admission of third party settlement agreements into evidence produced in an Alternate Dispute Resolution Procedure. Objections, doc 90, 1/28/16.

51.     At a hearing on the motion, Foster further objected citing *Quad/Graphics Inc. v. Fass et. al.* 724 F. 2d 1230, 1235 (7th Cir. 1983) holding that as a matter of public policy a settlement agreement between a party to the litigation and a third party cannot be admitted into evidence under Rule 408 of the Federal Rules of Evidence. Motion hearing, doc 92, 2/1/16.

52.     Pallmeyer admitted the third party settlement agreement between Foster and Pace into evidence, Minute entry, doc 95, 2/3/16.

53.     Becker and Drinker filed a motion to dismiss on the basis that there was a lack of subject matter jurisdiction at the time the complaint was filed under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6) of the Federal Rules of Procedure. Motion, doc 96, 2/3/16.

54.     Foster advised the court in his Response to the motion that Becker and Drinker were engaging in attorney misconduct by recanting their representation to the Seventh Circuit Court of Appeals that the amount in controversy exceeded $75,000 at the time the complaint was filed:

> If Principal's motion to dismiss under 12(b)(6) was affirmed by the 7th Circuit, such decision would constitute a judgement on the merits, *Winslow v. Walters*, 815 F. 2d 1114, 1116 (7th Cir. 1987). An attorney may not hold back a challenge to subject matter jurisdiction to obtain a judgement on the merits. An attorney that does so engages in misconduct for which he can be disciplined. *Enbridge Pipelines LLC v. Moore*, 633 F. 3d 602, 606 (7th Cir. 2011). In this case, Principal's attorney states to the 7th Circuit that there is subject matter jurisdiction to obtain a judgement on the merits, but now that Principal has lost, Principal's attorney raises subject matter jurisdiction by making a false statement to the district court that the amount in controversy is $75,000 or less.
> Foster Response, doc 100 p. 4.

55.     Principal attached all the settlement documents between Foster and Pace which were obtained from Pace under the Freedom of Information Act. Exhibits A-G to its motion papers, Attachments, 97-1 through 97-7:

> Exhibit A. Confidential Settlement Agreement between Foster and Pace.

> Exhibit B. Monthly Bills to the Pace North Shore Plan detailing the services performed by Foster for each month from March 1, 2011 through July 31, 2012.

> Exhibit C. Monthly Bills to the Pace River Plan detailing the services performed by Foster for each month from March 1, 2011 through July 31, 2012.

> Exhibit D. Monthly Bills to the Pace Heritage Plan detailing the services performed by Foster for each month from March 1, 2011 through July 31, 2012.

Exhibit E. Monthly Bills to the Pace Southwest Plan detailing the services performed by Foster for each month from March 1, 2011 through July 31, 2012.

Exhibit F. Pace 1028 401k Plan Consent Resolution [Apparently Pace lost or misplaced the Monthly Bills prepared by Foster detailing the services performed by Foster for each month from March 1, 2011 through July 31, 2012.].

Exhibit G. Foster's letters of resignation dated and effective September 19, 2012.

56.    Foster advised the district court that under Rule 12(d) if matters outside the pleadings are presented to and allowed by the court in a 12(b)(6) motion, then the motion must be treated as a motion for summary judgement. Foster Response, doc 100 at p.2.

57.    Foster complied with summary judgement procedures under Rule 56 in his response to the motion. Id. p. 10-15 and Exhibits.

58.    Foster advised the court in his response to the Rule 12(b)(1) dismissal that subject matter jurisdiction was determined by the Seventh Circuit Court of Appeals in Foster I and his Second Amended Complaint claiming lost income in the amount of $954,040 did not plead away subject matter jurisdiction. Id., p. 2-4.

59.    Foster reiterated his objections to the admission of the third party settlement agreement into evidence based on Rule 408 citing *Quad / Graphics, Inc. v. Fass et.al.,* 724 F. 2d 1230, 1235 (7th Cir. 1983); Local Rule 83.5 implementing 28 U.S.C. § 652(d); and further cited *Lynn v. CSX Transp. Inc*. 84 F. 3d 970, 974 (7th Cir. 1996) - a settlement agreement with a third party is irrelevant and not discoverable. Id. 5-7.

60.    Foster reasserted that Foster I had already decided that his claim was not barred by the settlement agreement between Foster and Pace. Id. p. 10.

61.    As Pallmeyer indicates below, Principal offered the settlement of Foster's lawsuit against Pace as a defense to Foster's claim on remand.

Plaintiff Francis Foster's claims against Principal Life insurance Company are before the court for a second time. The court initially dismissed those claims, but the Court of Appeals reversed. Principal contends on remand that Foster effectively released his claims against Principal when he settled an earlier lawsuit against another party. Principal moves the court for dismissal for failure to state a claim on this basis, or for dismissal of the case for lack of jurisdiction. 13-cv-03066, Mem. Opinion and Order, doc 106, p. 1, 9/29/16.

62.     Becker and Drinker misrepresented to the court that the Plan Committees were parties to the settlement agreement, and falsely stated "that Foster agreed to voluntarily resign his representation of the Pace Plans and West Plan as of July 31, 2012" when ¶ 6 of the settlement agreement states only that: "Foster agrees to resign as counsel for the Plans," but in so doing they admitted the Plan Committees terminated Foster as plan attorney:

> For the first time in this litigation, Foster now alleges that he was terminated as counsel by the committees for the Pace Plans. Specifically, Foster alleges that "[o]n or about August of 2012, each Pace Plan Committee and the West Plan Committee passed resolutions terminating Foster's representation." Id. ¶ 37. But Foster's Second Amended Complaint omits that Foster agreed to voluntarily resign his representation of the Pace Plans and West Plan as of July 31, 2012, and that the plan committees terminated his representation only after his agreement to voluntarily resign. Principal Mem. In Sup., doc 97, 2/3/16, p.4.
>
> Foster's allegation that each of the Pace Plan Committees terminated his representation in August 2012 is misleading. The Pace Plan Committees terminated Foster as counsel for the Pace Plans because Foster agreed to voluntarily resign. Id., p. 11.

63.     The court adopted Foster's interpretation of the settlement agreement in denying the motion for lack of subject matter jurisdiction under Rule 12(b)(1):

> Foster contests Principal's interpretation of the settlement agreement. Without specifically alleging duress, Foster alleges in his second amended complaint that he settled "in order to survive economically." (Second Amended Complaint ¶ 29.) He contends he did not resign voluntarily and that Principal caused a breach of his retention agreement when it stopped paying him. As Foster sees things, his resignations were perfunctory acts made after the Pace Plan Committees terminated [him] to comply with Rule 1.16 of the Illinois Rules of Professional Conduct that requires a lawyer to withdraw from representing a client when the attorney is discharged.
> Id. at p. 6.

64.     Dismissal based on Rule 12(b)(6) for failure to state a claim upon which relief can be granted was denied by obeying and implementing the court order mandate in Foster I:

More importantly, dismissal of this case on the basis of the settlement agreement Foster entered into with Pace would be directly contrary to the conclusion of the Seventh Circuit that Foster has stated a valid claim against Principal. Id. at p. 10.

65.    By operation of Rule 12(d), Pallmeyer's denial of the 12(b)(6) motion entered summary judgement that as a matter of law the settlement agreement between Foster and Pace was not a defense to Foster's claim against Principal.

66.    Principal was directed to answer Foster's Second Amended Complaint and in that answer, Becker and Drinker again disobeyed the court order mandate in Foster I by re-asserting the settlement agreement as a defense. Answer, doc 107, p. 15.

### Evidence on the Record

67.    On September 10, 2017, Foster filed a motion for summary judgement (Foster's Motion).

68.    Foster's Motion submitted the plan documents and related documents into evidence that the Plan Administrator of each Pace Union 401k plan is a Plan Committee composed of Pace appointed and Union appointed members in which the Pace appointed members on each committee have one vote and the Union appointed members on each committee have one vote; accordingly, action by the Plan Committees requires a consensus (100% vote) to take any action. Foster's Statement ¶ 5, doc 125, Exhibits A-1 through A-7; Foster Statement ¶ 26-33.

69.    Foster's Motion introduced into evidence the 2003 Plan Committee resolutions authorizing Foster's fixed monthly fee contracts with each Pace Union 401k Plan.  Foster Statement ¶¶ 18-21.

70.    Foster's Motion introduced into evidence a 2004 e-mail from Joseph Ellyin, a Plan Committee member on each Pace Union 401k Plan at that time, to ABN AMRO Trust Services,

the record-keeper to the Pace Union 401k Plans at that time confirming that the amounts remained the same for 2004. Foster Statement (entire e-mail quoted) ¶ 23.

71.     Foster's Motion introduced into evidence a March 2005 e-mail from Joseph Ellyin, a Pace appointed Plan Committee member on each Pace Union 401k Plan at that time, to ABN AMRO Trust Services the record-keeper to the Pace Union 401k Plans at that time confirming that the monthly amount of Foster's fees had not changed and ABN AMRO Trust Services was to continue processing the monthly fees in the same amounts unless otherwise notified:

> **From**: Joseph Ellyin [Joseph.Ellyin@Pacebus.com]
> **Sent**: Thursday, March 03, 2005 9:58 AM
> **To**: Washington, Darrell
> **Subject**: RE: Pace Union Plan Legal Fees
>
> Please proceed with legal payments as outlined in your message below until direction from me to the contrary.
>
> Thanks,
> Joe
>
> **-------Original Message------**
> **From**: Washington, Darrell [mailto:darrell.washington@abnamro401k.com]
> **Sent**: Wednesday, March 02, 2005 4:44 PM
> **To**: Joseph Ellyin
> **Subject**: Pace Union Plan Legal Fees
>
> Joe:
>
> Please confirm that ABN AMRO Trust Services Company per direction from the appropriate Retirement Plan Committee should continue processing the monthly legal invoices payment to Mullen & Foster for each plan in the amounts shown below until otherwise notified.
>
> Pace and ATU Local 1028 401(K) Retirement Plan: PNW - $2,550
>
> Pace Southwest Division 401(k) Retirement Plan:  PWS - $700
>
> Pace River Division Union Defined Contribution and 401(k) Plan: PRV - $500
>
> Pace Heritage Division-ATU Local 241 401(k) Plan: PHE - $550

Pace North Shore Division 401(k) Plan: PNS - $166.67

Thanks
Darrell Washington

Foster Statement ¶ 25 (entire e-mail quoted), Declaration ¶ 34, Exhibit A at p. 49.

72.     Foster submitted into evidence documentation that Principal acquired the Pace Union 401k Plan accounts from ABN AMRO Trust Services on November 28, 2005. Foster Statement, doc 125 ¶ 34, Foster's Declaration ¶ 37, Principal Notification in Exhibit A at p. 53; Request to Admit, Foster Statement ¶ 40, Exhibit A-12.

73.     Foster's Motion entered into evidence the Service and Expense Agreements between each Plan Committee and Principal which were executed on March 9, 2007 with an effective date of January 1, 2007.  Foster Statement ¶ 35, Exhibit A-10.

74.     Foster's Motion entered into evidence an e-mail dated April 5, 2011 from Pace employee Joseph Ellyin, who on that date was no longer a Pace appointed Plan Committee member on any of the Pace Union 401k Plans, instructing Principal that he must approve Foster's invoices, Statement of Facts ¶ 41.

75.     Foster's motion submitted into evidence an e-mail from Principal dated April 12, 2011 sending Foster's invoices to Joseph Ellyin for his approval in accordance with the April 5, 2011 e-mail. Statement of Facts ¶ 44.

76.     Foster's motion submitted into evidence Foster's e-mails transmitting his invoices for payment to Principal and Foster's letters to Principal demanding payment of his invoices. Statement of Facts ¶¶ 50-53.

77.     Foster's Motion submitted into evidence signed statements from each Union Plan Committee Member that were received by Principal in June 2011 stating that the Plan Committees never authorized a stop payment or any other change to the method of paying Foster's fees:

NOTICE

The undersigned hereby notifies Principal of the following:

> I am (We are in the case of the Pace 1028 401k Plan) the Union Plan Committee Member(s) of the …..
>
> I (We) never authorized instructions to stop payment or make any other change to the previous action of the Plan Committee authorizing the monthly fixed fee payment to the plan attorney on presentment of an invoice to Principal.
>
> Any notice by Pace or a Pace Plan Committee Member to stop paying or make any other change was not authorized by the Plan Committee, and consequently, is null and void.
>
> Foster Statement ¶ 48 (quoted in its entirety), Declaration ¶ 44; Exhibit A at p. 66, 67, 68, and 70.

78.     James Olszewski, Union Plan Committee Member for the River Division Plans stated his statement as follows:

NOTICE

The undersigned hereby notifies Principal of the following:

> I am the Union Plan Committee Member of the Pace River Division Union 401k and Pension Plan.
>
> I never authorized instructions to stop payment or make any other change to the previous action of the Plan Committee authorizing the monthly fixed fee payment to the plan attorney on presentment of an invoice to Principal.
>
> Any notice by Pace or a Pace Plan Committee Member to stop paying or make any other change was not presented to the Plan Committee for authorization, and consequently, is null and void.
>
> Foster Statement ¶ 49 (quoted in its entirety), Declaration ¶ 45; Exhibit A at p. 69.

79.     Foster I held that the above Union Plan Committee Statements were conclusive proof that any instructions from Pace were not authorized by the Plan Committees; nevertheless, Principal continued to follow the instructions from Pace employee Ellyin that stopped the payment of Foster's fees.

Foster then provided to Principal signed statements from each of the Pace union committee members affirming that they had not authorized the stop-payment on Foster's fees. Foster I at 970.

Principal persisted in this course of action even though Foster produced conclusive proof that the Pace Plan committees had not authorized the stop-payment order. Foster I at 971-972.

80.     Foster's Motion submitted into evidence a letter dated September 30, 2011 from Melinda Metzger, Deputy Executive Director of Pace, to Darrell Washington of Principal referencing the Pace Union 401k Plans:

Effective immediately, any authorization/direction with respect to the above referenced 401(k) Plans now requires two signatures - Joseph Ellyin and either Brett Burkhardt or Mark Klafeta. If you have any questions or concerns regarding this matter, please feel free to contact me at (847)228-2302.

Foster Statement [125] ¶ 56 (quoted in its entirety), Exhibit A [127-1] 83.

81.     Foster's Motion entered into evidence an e-mail dated 10/5/11 from Darrell Washington of Principal to Pace employees Brett Burkhardt, Mark Klafeta and Joseph Ellyin stating that Principal will comply with the two Pace employee signature requirement to authorize "payment of outsider provider invoices" which would include Foster's invoices. Foster Statement ¶ 57, Exhibit A [127-1] 84.

82.     Foster's Motion entered into evidence an e-mail dated August 2, 2012 with a subject matter "Legal Invoices for Pace Union retirement plans" from Darrell Washington to Pace employees Mark Klafeta, Brett Burkhardt and Joseph Ellyin stating that Principal will continue to comply with the two Pace employee signature authorization requirement:

We have reiterated to our service team if we receive any invoices not to pay without proper authorization.

Foster Statement [125] ¶ 58 (quoted in its entirety), Exhibit A [127-1] 76.

83.     Foster entered into evidence his Declaration under oath that his letters of resignation signed, dated and effective September 19, 2012 were withdrawal letters which he executed and then delivered to his attorney after his attorney advised him that he was discharged by the Plan Committees. Foster's Statement, ¶ 69, Declaration ¶ 62.

84.     Foster's Motion submitted into evidence the minutes of the Plan Committee meetings in or about August 2012 that passed the motions to pay Foster's outstanding bills from March 1, 2011 through July 31, 2012 and the minutes of the Plan Committee meetings immediately following that meeting establishing that the Plan Committees never received a letter of resignation or other communication from Foster stating that he resigned his position as plan attorney. Foster Statement of Fact ¶¶ 59-68.

85.     Foster's evidence included the Minutes of the Pace West Division Plan Committee Meeting on August 22, 2012 acknowledging that Foster was terminated ("close all issues") by the resolution passing the motion to pay his outstanding bills:

> Frank Foster legal bills for services rendered from March 2011 through July 2012 in the amount of $26,911.00 were presented.  Dave Iverson moved to approve Frank Foster legal bills, Nancy Zimmer seconded the motion.  Motion carried.  Marcellus Barnes brought up the issue that Frank Foster bills for the months of March, 2011 through May, 2011 had no detailed professional services listed.  It was explained that Frank Foster was on a retainer, and the $1583.00 amount was his monthly fee. Mr. Barnes stated that he understood.  This payment to Frank Foster LLC will close all issues regarding Frank Foster.
> August 22, 2012 Minutes, Foster Statement ¶ 59, Declaration ¶ 52, Exhibit A-13 at p. 2.

86.     Foster's evidence included the August 10, 2012 Minutes of the Pace North Shore Division 401(k) Plan Committee Meeting, in which Darrell Washington of Principal was present, specifically acknowledging that Foster was terminated by the motion to pay his outstanding bills.

> Mark Klafeta then provided copies of Francis T. Foster LLC outstanding invoices and motioned that they be paid.  The invoices covered the past seventeen months through July, 2012.  Mr. Foster's monthly "retainer'' was $333.00 so the total would be $5,661.00.  Marcellus Barnes noted that they are okay to pay.  Motion carried.
> It was noted that new counsel would be necessary.

8/10/12 Minutes, Foster Statement ¶ 68, Declaration ¶ 61; Exhibit A-13 at p. 24-25:

87.    Foster's evidence included the Minutes of the Pace River Division 401(k) Plan

Committee Meetings on August 2, 2012 and the immediately following September 14, 2012

Meeting, in which Darrell Washington of Principal was present, specifically acknowledging that

Foster was terminated by the motion to pay his outstanding bills:

> A conference call was held on the above date with the only item on the agenda being payment of legal services from Francis T. Foster LLC. Discussion took place as to the period covered by the invoices. It was noted that the invoices included notations as to work performed with respect to the updated determination letter.

> Mark Klafeta made a motion to pay Francis T. Foster LLC $8500 which covers the period March, 2011 through July 2012. James Olszewski seconded the motion. Motion carried.

> It was noted that the next meeting is scheduled for September 14, 2012. Meeting Adjourned.
> 8/2/12 Minutes, Foster Statement ¶ 67, Declaration ¶ 61; Exhibit A-13 at p. 22

> Discussion then took place with respect to the naming of a replacement attorney. Mark Klafeta noted that he will get information for James Olszewski on Tom Paravola for consideration by the committee.
> 9/14/12 Minutes, Foster Statement ¶ 67, Declaration ¶ 61; Exhibit A-13 at p. 22.

88.    Foster's evidence included the Minutes of the Pace Southwest Division 401(k) Plan

Committee Meetings on August 10, 2012 consisting of one sentence and the immediately

following November 12, 2012 Meeting, in which Darrell Washington of Principal was present,

specifically acknowledging the Plan Committee needed a plan attorney:

> Approved via conversation w/ M. Barnes on 08/10/12 @ Principal's office – paying invoices in regular course of business.
> 8/10/12 Minutes, Foster Statement of Facts ¶ 65, Declaration ¶ 58, Exhibit A-13 at p. 18

> Darrell Washington suggested the committee look into the Wilshire service for the Plan. MK [Mark Klafeta] stated that he would like to have an attorney review the documentation for the Wilshire service.
> 11/12/12 Minutes, Foster Statement of Facts ¶ 65, Declaration ¶ 58, Exhibit A-13 at p. 18.

89.     Foster's evidence included the Minutes of the Pace Heritage Division 401(k) Plan Committee Meetings on August 13, 2012 consisting of one sentence and the immediately following December 14, 2012 Meeting in which Darrell Washington of Principal was present that specifically acknowledged Foster was terminated by the motion to pay his outstanding bills by hiring a new plan attorney:

> Approved via conversation w/Tom Flynn on August 13, 2012 at Pace Heritage normal course of business.
> 8/13/12 Minutes, Foster Statement of Facts ¶ 63, Declaration ¶ 56, Exhibit A-13 at p. 15.
>
> General discussion then took place with respect to a new plan attorney including various outstanding issues such as the Wilshire Agreement and need for an Investment Policy under the Agreement.  A Motion was made by Mark Klafeta to utilize Tom Paravola as the plan attorney. Tom Flynn seconded the motion.  Motion carried.
> December 14, 2012 Minutes, Foster Statement of Facts ¶ 63, Declaration ¶ 56, Exhibit A-13, p. 15.

90.     Foster's evidence included the Pace ATU Local 1028 Plan Committee September 7, 2012 Consent Resolution authorizing the payment of Foster's fees from March 1, 2011 through July 31, 2012 and submitted into evidence the minutes of the Plan Committee meeting on December 5, 2012 immediately following the Consent Resolution in which Darrell Washington of Principal was present, where the Plan Committee specifically acknowledged Foster was terminated by the Consent Resolution by taking action to appoint a new plan attorney:

> Be it resolved by the unanimous consent of the Pace and ATU Local 1028 401(k) Plan Board of Trustees that payment of all the outstanding legal bills of Mullen & Foster for the period of March 2011 to July 2012 totaling $43,350 is hereby authorized and is it to be immediately paid.
> Unanimous Consent Resolution dated September 7, 2012, Foster Statement ¶ 60, Exhibit A-13 at p. 6.
>
> The next order of business had to do with the Committee appointing a new Plan attorney. The Chairman handed out information regarding Mr. Tom Paravola for consideration.  Mr. Matthews questioned why the information regarding Mr. Justin Lannoyne was not handed out to the Committee for consideration. The Chairman indicated that he never received any information regarding Mr. Justin Lannoyne.  Mr. Matthews stated that he was certain that he had sent the information regarding Mr. Lannoyne to the Chairman.  The Chairman again

stated he had not received any such information from Mr. Matthews.  A motion was made by Melinda Metzger to appoint Mr. Tom Paravola as the new Plan Attorney, Cecil Crum seconded the motion.
December 5, 2012 Minutes, Foster Statement ¶ 61, Declaration ¶ 54, Exhibit A-13 at p. 8.

91.     At the time Foster filed his motion for summary judgement on September 10, 2017 fact discovery was set to close on October 6, 2017, doc 112; Pallmeyer granted Principal an extension, doc 137 and Principal deposed Foster, Ellyin and the Union Plan Committee members.

92.     The Union Plan Committee Members authenticated in their depositions their signed statements that Foster introduced into evidence. Principal Response, doc 146-4 Exhibit 4 p. 12; doc 146-5, Exhibit 5 p 16; doc 146-6, Exhibit 6 p. 10; doc 146-7, Exhibit 7 p. 9; doc 146-8, Exhibit 8 p. 10.

93.     Ellyin testified in his deposition on October 31, 2017 that he was a Pace appointed Plan Committee member on each of the Pace Union 401k Plans and other Pace plans from 2001 to March 2011 when he was removed by T. J. Ross, Executive Director of Pace. Ellyin Dep. [145-2], 11:7-12; 13:15-18.

94.     Porter who deposed Ellyin asked about the March 2005 e-mail:

Q. In March of '05 Mr. Washington is still with ABN AMRO?
A. Yes. Ellyin Dep. [145-2], 36:10-12.

Q. You say, "Please proceed with legal payments as outlined in your message below until direction from me to the contrary." Did I read that correctly?
A. Yes. Id. 13-16

Q. What did you mean when you said that?
A. That until I receive instructions from the committees to change these fees, that the service provider, record-keeper, is to continue paying these fees. Id. 17-22.

95.     Ellyin admitted in his deposition that the Plan Committees did not authorize him to approve any invoices. Id. 70:14-18.

96.     Foster consistently testified in his deposition taken on October 3, 2017 that he prepared and executed the letters of resignation only after he was terminated by the Plan Committees; that he never delivered the resignation letters to the Plan Committees; and the letters were withdrawal letters to comply with Rule 1.16 of the Illinois Rules of Professional Conduct requiring a lawyer to withdraw from representing a client when the attorney is discharged including:

Q. Mr. Foster, you weren't terminated as the plan attorney from any of the plans, right?
A. I was terminated. Foster's Dep. [146-1] 172:22-24.

Q. You resigned as the attorney for each of the plans, didn't you?
A. No. Id. 173:1-3.

Q. You didn't send each plan a resignation letter, is that right?
A. That's right, I did not send the plan a resignation letter.  Id. 173:4-7.

Q. I'm going to show you some documents. Id. 173:8
Q. Is Principal's Exhibit 11 signed resignation letters from you dated September 19, 2012 addressed to each of the Plan Committees?
A. Yes. But it was never delivered to the Plan Committees. Id. 173:23-24, 174:1, 174:2-3.

Q. It's your testimony today that you never resigned from any of the Plan Committees, correct?
A. I resigned after I was terminated is my testimony. Id. 174:4:7.

Q. These letters were never delivered to the Plan Committees, is that your testimony?
A. Right. Id. 174:8-10.

Q. How did you resign from the Plan Committees?
A. My testimony is I wrote a resignation letter after I was terminated and I gave the letter to my attorney who gave it to Pace.  But these letters were never delivered to the Plan Committee. So in order to legally have a resignation, these would have had to have been delivered to the Plan Committee.
So, all these letters can be is just an acknowledgement that I'm no longer the plan attorney, which is required under the professional rules of conduct for attorneys. Id. 174:11-23.

Q. Did you resign from the Plan Committees or not? A. I resigned after I was terminated.
Q. How did you resign? A. With this letter. Q. That you never gave to the Plan Committees?
A. I didn't give it to the Plan Committees. Q. How did the Plan Committees know that you resigned? A. They didn't. Id. 175:10-22.

A. I did not resign until I was terminated. There's a need to, like when you withdraw in litigation, you know, if your client fires you, you still have to withdraw formally and make a motion with the judge and withdraw. That's exactly what this is. Id. 176:4-10.

A. I have to resign under the rules of professional conduct of attorneys. Id. 179:16-17.

A. The answer to your question is if the Plan Committees terminated me, then I was required to resign. Id. 180:3-5.

97.     On November 10, 2017, when all of the above evidence is on the record, Principal filed a Cross Motion for Summary Judgement. Motion, doc 144.

**Becker Porter and Drinker's Fraud upon the Court –**
**Disobedience of the Foster I court order mandate.**

98.     Becker Porter and Drinker on remand disobeyed the Foster I court order mandate and deceived the court by offering the settlement agreement between Foster and Pace into evidence when Foster I held the settlement agreement with Pace did not preclude Foster's claim against Principal.

99.     Becker Porter and Drinker on remand disobeyed the Foster I court order mandate and deceived the court by offering the settlement agreement between Foster and Pace as a defense to Foster's claim in their Rule 12 motion when Foster I held it was not a defense.

100.    Becker Porter and Drinker on remand disobeyed the court order mandate in Foster I and deceived the court by offering the settlement agreement between Foster and Pace as a defense in their answer to Foster's second amended complaint when Foster I held it was not a defense.

101.    Becker Porter and Drinker on remand disobeyed the court order mandate in Foster I and deceived the court by stating that Principal could withhold payment of Foster's invoices until Ellyin approved them, when Foster I held the signed statements from the Union Plan Committee Members entered into evidence conclusively proved that Principal received notice that the Plan

Committees did not authorize Ellyin or anyone else to approve Foster's invoices or take any other action that would stop the payment of Foster's fees.

102.     Becker Porter and Drinker on remand disobeyed the court order mandate in Foster I and deceived the court by inducing and causing Pallmeyer to reinstate her original judgement vacated in Foster I that Foster's claim is barred by the settlement agreement resolving the Pace litigation.

**Becker Porter and Drinker's Fraud upon the Court – the March 2005 E-Mail**

103.     Becker Porter and Drinker made the following statements to the court:

Principal Life paid the expenses of the Plans, including Plaintiff's fees, according to notice provided by Joseph Ellyin as the plan representative of each Plan. Id. ¶ 19. The notice provided by Joseph Ellyin was pursuant to the provisions of the Service and Expense Agreements. Id. ¶ 20. Principal Life had no authority to pay the Plans' expenses without approval from the Plan Committees, which was communicated to Principal through Mr. Ellyin. Id. ¶ 21. [Cross Memorandum in Sup. & Response, doc. 147, 11/10/17 p. 4-5.]

In March 2005, Darrell Washington, the Principal Life Relationship Manager for the Plans, received a notice from Joseph Ellyin directing Principal Life to pay Plaintiff's fees at established fixed rates "until direction from me to the contrary." Id. ¶ 24. [Id. p. 5.]

Mr. Ellyin did not give Principal Life any additional direction regarding the payment of Plaintiff's fees from March 2005 until April 2011. Id. ¶ 25. Accordingly, for each month from March 2005 to February 2011, Principal Life paid Plaintiff a fixed monthly fee for the services he asserted he rendered to each Plan in accordance with, and in the amounts specified in Mr. Ellyin's March 2005 e-mail. Id. ¶ 26. [Id. p.5.]

For years, Principal Life paid Plaintiff's invoices at the direction of the Plans representative Joe Ellyin. In 2005, Mr. Ellyin, as designated plan representative for the Plans, directed that Plaintiff's fees be paid "until direction from me to the contrary." See Principal Life's LR 56.1 Stmt. ¶24. Principal Life acted on those orders—which were consistent with its Service and Expense Agreements with each of the Plans—until April 5, 2011, Mr. Ellyin directed Principal Life that "[e]ffective immediately, I need to approve all non-Principal invoices for the Pace's union plans." Id. ¶35. [Id. p.15.]

Each Service and Expense Agreement made clear that Principal Life would only act through Notice between the parties (defined as Principal Life and the undersigned plan representative, Joseph Ellyin) or between Principal Life and a "participant" (defined as a person entitled to benefits under the Plan). ¶¶ 13-14. [Id. p. 16.]

104.     Except for the ¶ 35 reference to Principal's Statement of Facts, Foster disputed each and every ¶ reference to Principal's Statement of Facts in the quotations above in his Response to Principal's Statement of Facts; Foster disputed that part of ¶ 21 stating Ellyin communicated Plan Committee approval to Principal.

105.     Becker Porter and Drinker falsely stated to the court that Ellyin communicated to Principal the Plan Committees' approval to pay plan expenses (i.e. "For years, Principal Life paid Plaintiff's invoices at the direction of the Plans representative Joe Ellyin") when there is no such communication on the record and Ellyin testified in his deposition that he did not have approval from the Plan Committees to approve any invoices.

106.     Becker Porter and Drinker falsely stated to the court that the March 2005 e-mail was to Principal when it was to ABN AMRO Trust Services, the record-keeper at that time; Principal did not acquire the Pace Union 401k Plan accounts from ABN AMRO Trust Services until November 28, 2005. Foster Statement, doc 125 ¶34, Exhibit A, doc 127-1 at p. 53; Request to Admit, Foster Statement ¶ 40, Exhibit A-12.

107.     Becker Porter and Drinker falsely stated to the court that the March 2005 was made pursuant to the Service & Expense Agreements between Principal and the Plan Committees, which was impossible, as the Service & Expense Agreements were not executed until March, 2007 with an effective date of January 1, 2007.

108.     Becker Porter and Drinker falsely stated to the court that Ellyin is the Party to the Service and Expense Agreement when Ellyin merely executed the Agreements on behalf of the Plan Committees who are identified in said Agreements as both the Plan Representative (i.e. the Pace Heritage Division Plan Committee is identified as the Pace Heritage Division Plan Representative) and the Party to the Service and Expense Agreements:

This Agreement is made by and between the undersigned Plan Representative ("you", "your") and the undersigned member company of the Principal Financial Group ("we", "us", "our"). You and we are the "Parties" to this Agreement. Each of the Parties may be referred to separately as a "Party". Foster Statement of Facts, doc 125 ¶ 35, Page 1 of the S&E Agreements, Exhibit A-10 [127-11].

Each of the Parties represents and warrants that it has the authority to enter into this Agreement and be bound by it. Each individual [Joseph Ellyin for the Plan Committees and Larry Zimpleman for Principal] signing this Agreement represents and warrants that she or he has, individually or together with any other persons signing this Agreement on behalf of the same Party, the authority to sign this Agreement and make it binding on the Parties. Id.

109. Becker Porter and Drinker falsely stated to the court that, under the Service & Expense Agreements, Ellyin has authority to direct Principal by sending a Notice to Principal when pursuant to said Agreements only the Plan Committee Parties or Plan Participants have authority to direct Principal by Notice:

Notice may be between the Parties or between us and a Participant (as allowed under the Plan Document). Foster Statement of Facts ¶ 35, Article IV, S&E Agreements, Exhibit A-10 [127-11].

110 Becker Porter and Drinker continued the March 2005 fraudulent narrative to the court even though the evidence on the record established that even if Ellyin approved Foster's invoices, Principal would not pay them unless one other designated Pace employee signed off on the payment.

111. Becker Porter and Drinker continued the March 2005 fraudulent narrative to the court, even though they knew from the signed Union Plan Committee statements that the Plan Committees never authorized Ellyin to approve Foster's invoices.

112. Becker Porter and Drinker misrepresented the law to the court that a person has the right to follow a directive from an agent/plan representative after the person receives notice that the directive was not authorized by the principal/plan administrator. *Foster I* at 971-972; *Mason*

*& Dixon Lines, Inc. v. Glover,* 975 F. 2d 1298, 1305 (7th Cir. 1992): "We hold that the plaintiffs had notice that Glover lacked authority to agree to a settlement on behalf of the other Trustees."

### Becker Porter and Drinker's Fraud upon the Court – Their False Statements to the Court that Foster Resigned.

113.    Foster I specifically adjudicated that Foster stated a tort claim against Principal for tortious interference with prospective economic advantage under Illinois law. Foster I, 972.

114.    Foster I specifically adjudicated that under the Illinois Joint Tortfeasor Contribution Act [740 ILCS 100/2], the settlement with Pace does not discharge Principal's tort liability to Foster:

> Principal does not assert that it was specifically named in a release in the Pace litigation. Thus, Principal's liability is not discharged under the plain language of the Act.
> Foster I, 974.

115.    Foster I specifically adjudicated that the defenses of res judicata and collateral estoppel cannot be met under the facts presented in Foster I. Id., 973.

116.    Foster I specifically adjudicated that there was no indication Principal was somehow released by the terms of the confidential settlement agreement between Foster and Pace, which includes the terms that Foster agrees to resign as counsel for the Plans in ¶ 6 if the "Condition Precedent" in ¶ 3 occurs. Foster I at 973.

117     Foster I vacated the district court's judgement that Foster's claim was barred by the settlement of Foster's lawsuit against Pace. [Judgement described at 972; vacated at 974].

118.    A resignation in response to an extreme cut in pay (100% is extreme) is a constructive discharge. *Pennsylvania State Police v. Sanders*, 542 U.S. 129, 134 (2004); *Motley v. Human Rights Comm'n*, 636 N.E. 2d 100, 104 (1994).

119.    A resignation in response to a breach of the contract by the employer constitutes a declaration of breach of that contract. *Galesburg Clinic Ass'n v. West,* 706 N.E. 2d 1035, 1035-37.

120     "The resignation takes effect not when the employee signs the letters of resignation but when the employee *communicates* to the employer, in writing or otherwise, an intent to unconditionally relinquish the position." *Rohrback v. Ill Dept. of Employment SEC.*, 835 N.E. 2d 955 at 962 (2005) citing the Illinois Supreme Court, *People ex. Rel. Adamowski v. Kerner*, 19 Ill 2d 506 at 512; 167 N.E. 2d 555 at 558 (Illinois Supreme Court 1960).

121.    A letter of resignation must be received by the proper authority. *Weber v. Bd. Of Fire & Police Com'rs*, 562 N.E. 2d 318, 320 (1990).

122.    There are no magic words such as "you're fired" to discharge an employee -- as long as the employer communicates to the employee that he or she is being discharged, a contemporaneous resignation by the employee is of no consequence. *Hinthorn v. Roland's of Bloomington, Inc.* 119 Ill. 2d 526, 531, 519 N.E. 2d 909 (Illinois Supreme Court 1988).

123.    Rule 1.16 of the Illinois Rules of Professional Conduct for Attorneys requires a lawyer to withdraw from representing a client when the lawyer is discharged.

124     Becker and Drinker represented to the Seventh Circuit in Foster I that the amount in controversy exceeded $75,000 at the time the complaint was filed in order to obtain a judgement on the merits, but then after losing on the merits, they falsely stated to the district court on remand that the resignation terms in the settlement agreement bars any recoverable damages at the time the complaint was filed. Mem. Opinion and Order, doc 106, 9/29/16, p. 4, 6.

125.    Becker Porter and Drinker misrepresented the law to the court that a resignation while the employer is in breach of contract for non-payment of compensation is a resignation when it is a constructive discharge or declaration of breach of contract.

126.    Becker Porter and Drinker misrepresented to the court on remand that the settlement agreement between Foster and Pace was admissible into evidence when the rules of evidence, public policy and a Congressional statute prohibit its admission into evidence.

127.    Becker Porter and Drinker, on remand, falsely stated to the court in their Rule 12 motion that the resignation terms in the settlement agreement between Foster and Pace defeat Foster's tort claim against Principal, when Foster I adjudicated that under the Illinois Joint Tortfeasor Contribution Act [740 ILCS 100/2], the settlement agreement between Foster and Pace does not discharge Principal's tort liability to Foster and also held the terms of the settlement agreement between Foster and Pace, which includes the resignation terms, does not defeat Foster's tort claim against Principal.

128.    Becker and Drinker falsely stated to the court in their Rule 12 motion papers that the Plan Committees were parties to the settlement agreement between Foster and Pace when they were not.

129.    Becker and Drinker falsely stated to the court in their Rule 12 motion papers "that Foster agreed to voluntarily resign his representation of the Pace Plans and West Plan as of July 31, 2012" under the settlement agreement when the settlement agreement states only that: "Foster agrees to resign as counsel for the Plans."

130.    Becker Porter and Drinker falsely stated to the court that Foster resigned his position as plan attorney even though they admitted in their Rule 12 motion papers that Foster was terminated by the Plan Committees effective July 31, 2012.

131.    Becker Porter and Drinker, on remand, falsely stated to the court in their answer to Foster's second amended complaint that the resignation terms in the settlement agreement between Foster and Pace defeats Foster's tort claim against Principal, when Foster I adjudicated that under the Illinois Joint Tortfeasor Contribution Act [740 ILCS 100/2], the settlement agreement between Foster and Pace does not discharge Principal's tort liability to Foster and also held that the terms of the settlement agreement, which includes the resignation terms, does not defeat Foster's tort claim against Principal.

132.    Becker, Porter and Drinker falsely stated to the court in their cross motion for summary judgement that "he [Foster] tendered written resignations to each of the Plan Committees," Cross Mem. In Sup. & Response, doc. 147, 11/10/17 at p. 13, fn. 3, when the evidence on the record establishes that the letters of resignation were never delivered to the Plan Committees.

133.    Becker Porter and Drinker falsely stated to the court in their motion for summary judgement that Foster's fees were paid through September 2012, Reply in Sup., doc 158, 12/27//17 p. 10, when the evidence on the record establishes the only fees paid were from March 1, 2011 through July 31, 2012.

134.    Becker Porter and Drinker in their motion for summary judgement repeatedly and falsely stated to the court that Foster resigned or voluntarily resigned his position as plan attorney. Cross Mem. In Sup. & Response, doc. 147, 11/10/17 p. 8, 10, 11, 12, 13, 19, 20, 22, and 23; Reply in Sup. Cross Motion, doc 158, 12/27/17, p. 4, 6, 9, and 10.

135.    The Minutes of the Plan Committee Meetings entered into evidence establish that the Plan Committees never received Foster's letters of resignation or any other communication from Foster that he was relinquishing his position as plan attorney; further, said Minutes reflect

that the Plan Committees treated the resolutions to pay Foster's outstanding bills as a final payment to Foster and termination of his contractual representation as plan attorney effective July 31, 2012.

136.    Foster consistently testified in his deposition [146-1], that he prepared and executed the letters of resignation only after he was terminated by the Plan Committees; that he never delivered the resignation letters to the Plan Committees; and the letters were withdrawal letters to comply with Rule 1.16 of the Illinois Rules of Professional Conduct requiring a lawyer to withdraw from representing a client when the attorney is discharged.

137.    The confidential settlement agreement between Foster and Pace is not a resignation; it is impossible for the confidential settlement agreement to be a communication from Foster to the Plan Committees that he is relinquishing his position as plan attorney.

138.    The letters of resignation are not resignations, as the evidence on the record establishes that the letters were never delivered to the Plan Committees; without delivery, the letters are not communications to the Plan Committees that Foster is relinquishing his position as plan attorney.

139.    All of the evidence on the record establishes that Foster did not otherwise resign by communicating to his Plan Committee employers that he is relinquishing his position as plan attorney.

### Pallmeyer's Continuation of Becker Porter and Drinker's Fraud upon the Court -- Disobedience of the Foster I Court Order.

140.    Foster raised law of the case and related doctrines on remand including:

Finally, the 7th Circuit Court of Appeals in *Foster v. Principal Life Ins Co.* 806 F. 3d 967 (2015) held that Foster's claim is not precluded by his settlement with Pace and Pace employees which includes whether Principal was somehow released by its terms:

> Nor is there any indication that Principal was somehow released by the terms of Foster's confidential settlement agreement with Pace and Pace employees in the earlier litigation. Foster v. Principal, 806 F. 3d 973.

Foster's resignation letter on the occurrence of a condition precedent is a term of the settlement agreement. Principal failed to raise this term and contrary to a release argument which would preclude damages, Principal represented to the 7th Circuit that the amount in controversy was in excess of $75,000. *Foster v. Principal* # 14-3203 doc 14 filed 10/21/14. The 7th Circuit's holding is an adjudication upon the merits under Federal Rule of Civil Procedure 41(b). *Semtek Int'l v. Lockheed Martin Corp*., 531 U.S. 497, 506 (2001). Accordingly Principal is bound by the 7th Circuit's adjudication under the Law of the Case Doctrine. *Semtek Int'l Inc*. at 506. Foster's Reply Brief to Principal's Response Brief to Motion for Summary Judgement, doc 155, 12/4/17 at p. 10-11.

Principal is not Foster's employer, but a third party who tortiously interfered with Foster's contractual relationship with the Plan Committees that caused a breach of Foster's contracts with the Pace Plan Committees. Principal's argument that it is released from liability based solely on the word "resign" in the settlement agreement between Foster and Pace has no legal or factual basis. Foster's Mem. In Supp. P. 10-11, and Reply Brief p. 9-11. Further, the issue has been adjudicated in Foster's favor by the 7th Circuit, Foster v. Principal 806 F. 3d 967 at 973 (7th Cir. 2015), which must be followed under the Law of the Case Doctrine. Foster's Memorandum in Opposition to Defendant (Principal)'s Cross-motion for summary judgement, doc 157, 12/13/17 at p. 14.

141.    Foster indicated to the court that it applied the law of the case doctrine in denying Principal's motion to dismiss, which by attaching the settlement documents to the motion papers, entered summary judgement under Rule 12(d) that as a matter of law the settlement agreement is not a defense to Foster's claim against Principal.

The district court's Memorandum & Order of 9/29/16 effectively applied the Law of the Case Doctrine in denying Principal's motions to dismiss Foster's Second Amended Complaint. Doc 106 Mem. & Order, 9/29/16 at p. 10. [Reply Brief to Principal's Response Brief to Foster's Motion for Summary Judgement, doc 155, 12/4/17 at fn. 3 p. 11.]

142.    Pallmeyer disobeyed the court order mandate in Foster I and deceived the court by allowing the settlement agreement between Foster and Pace into evidence when Foster I held the settlement agreement with Pace did not preclude Foster's claim against Principal.

143.    Pallmeyer disobeyed the court order mandate in Foster I and deceived the court by suppressing and rejecting the signed Union Plan Committee statements, received by Principal in

June 2011, which were designated as conclusive proof in Foster I that the Plan Committees never authorized Ellyin to approve Foster's invoices.

144.    Pallmeyer disobeyed the court order mandate in Foster I and deceived the court by reinstating her original judgement vacated in Foster I that Foster's tort claim against Principal is barred by the settlement agreement resolving the Pace litigation.

### Pallmeyer Accepts, Adopts and Restates Becker Porter and Drinker's Fraud upon the Court on the March 2005 E-mail

145.    Pallmeyer accepted, adopted and restated to the court the false statements of Becker Porter and Drinker on the March 2005 e-mail:

> Foster suggests Ellyin was not authorized to speak for the Plan committees, and it is undisputed that the committees never adopted a resolution that reversed the long-standing pattern of payments.  But this is an awkward argument, in light of the fact that it was Ellyin who, in March, 2005, directed Principal to pay Plaintiff's monthly fees "until direction from me to the contrary." Ellyin was in fact the Plan Representative, and the Service and Expense Agreements provided that Principal Life should take instructions from him. Memorandum Opinion and Order, doc 175, 9/30/18 (Opinion) p.13.

146.    The documentary evidence on the record establishes that the March 2005 e-mail was to ABN AMRO Trust Services and not Principal; the Service & Expense Agreements did not exist until 2007; and any "instructions" to Principal pursuant to the Service and Expense Agreements must be from the Plan Committees who are the Parties to the Agreement.

147.    Pallmeyer accepts adopts and restates to the court Becker Porter and Drinker's misrepresentation of law that a person has the right to follow a directive from an agent/plan representative after the person receives notice the directive was not authorized by the principal/plan administrator.

148.    Pallmeyer suppresses and rejects the Union Plan Committee signed statements which constituted conclusive proof that Principal knew the Plan Committees never authorized Ellyin to approve Foster's invoices; Principal's continued compliance with the unauthorized

directive meets the definition of theft under the Illinois Criminal Code, 720 ILCS 5/16-1(a): "exerts

unauthorized control over the property of another."

149.    Pallmeyer suppresses and rejects the evidence on the record establishing that

Principal complied with Pace's two signature authorization requirement so that even if Ellyin did

approve Foster's invoices, Principal would not pay Foster's invoices unless one of the other

designated Pace employees signed off on the payment.

### Pallmeyer's Continuation of Becker Porter and Drinker's Fraud upon the Court that Foster Resigned his Position as Plan Attorney.

150.    Foster presented to the court that Foster never resigned:

Foster never resigned. A resignation must be received by the proper authority, and the proper authority in this case is the Plan Committees, *Weber v. Bd. Of Fire & Police Com'rs*, 562 N.E. 2d, 320 (1990), 204 Ill. App. 3d 358.  In this case, Foster's resignation letters were never presented to the Plan Committees.  In fact, the Plan Committees terminated Foster before his resignation letters of September 19, 2012 existed. Statement of Facts ¶¶ 59-68.  His letters of resignation were perfunctory acknowledgements of his termination and letters of withdrawal as plan attorney in compliance with Rule 1.16(a)(3) of the Professional Rules of Conduct for Attorneys. Mem. In Sup, doc 124, 9/10/17, p. 10.

Principal's contention that Foster voluntarily resigned is also defeated as a matter of law. All resignations are voluntary within the literal meaning of the term "voluntary." In employment contract law, a voluntary resignation occurs when the employee resigns as a matter of choice (i.e. resigns for a better paying job with a new employer).  When the employer breaches the contract and stops paying the employee, the employee no longer has a choice and at some point must resign, since permanently working without pay is not a viable alternative. Mem. In Sup, doc 124, 9/10/17, p. 11.

A constructive discharge includes a situation where the employee quits in response to an extreme cut in pay. *Pennsylvania State Police v. Sanders*, 542 U.S. 129 at 134 (2004).  See for example: A cut in pay from $26,000 to $9,600. *Zabielski v. Montgomery Ward & Co. Incorporated,* 919 F. 2d 1276, 1281 (7th Cir. 1990); One third reduction in salary even though the employee was still paid $150,000 in salary. *Scott v. Harris Interactive Inc.*, 12-1414-cv (2nd Cir. February 20, 2013).  Obviously, a resignation caused by Principal's complete elimination of Foster's pay would be a constructive discharge. Id.

A resignation by Foster would be a declaration of breach of contract for failure to pay his fees. *Galesburg Clinic Ass'n v. West*, 706 N.E. 2d 1035 at 1037-1038 (1990).  When a third party causes a breach of contract, either party to the contract may terminate the contract and claim tortious interference with contract or prospective economic advantage against

the third party. Principal's contention that Foster is required to work without pay to preserve his claim against Principal is absurd and so is the assertion that Principal is exonerated by a resignation in response to a breach of contract caused by Principal. Reply Brief, doc 155, 12/4/17, p. 10.

151.    Foster entered into evidence and presented to the court the Minutes of the Plan

Committee Meetings establishing that Foster was terminated by the Plan Committees:

There is no indication that Foster is to remain employed as the plan attorney for the Pace Plans after the motion to pay bills. In fact, there is a plethora of evidence to the contrary:

| PLAN | DATE | STATEMENT OR ACTION IN MINUTES |
|------|------|-------------------------------|
| West | 8/22/12 | This payment to Frank Foster LLC will close all issues regarding Frank Foster. Doc. 127-14, Exhibit A-13 p. 2 Foster Motion |
| North Shore | 8/10/12 | It was noted that new counsel would be necessary. Id. p. 25 |
| River | 9/14/12 | There was a discussion with respect to naming a replacement Plan attorney. Id. p. 22 |
| 1028 | 12/5/12 | Next order of business had to do with the Committee appointing a new Plan attorney. Id. p. 8 |
| Heritage | 12/14/12 | Tom Paravola was appointed the new plan attorney. Id. p. 15 |
| Southwest | 11/12/12 | Mark Klafeta, Pace Plan Committee Member states that he would like to have "an attorney" review the documents for Willshire services. Id. 27. |

Foster withdrew from representing the Pace Plans by his resignation letter executed and effective on September 19, 2012. Id. p. 28-32. The first three statements occurred prior to September 19, 2012. An agreement with a third party to resign on the occurrence of a condition precedent is not a resignation. To constitute a legal resignation in this case, a letter of resignation must be delivered and receipt acknowledged in the minutes of the Pace Plan Committee meetings, which did not occur. *Weber v. Bd. Of Fire & Police Com'rs,* 562 N.E. 2d 318, 320 (1990), 204 Ill. App. 3d 358. Reply Brief to Principal's Response Brief to Motion for Summary Judgement, doc 155, 12/4/17 at p. 9-10.

152.    Pallmeyer accepted, adopted and restated to the court the false statements of Becker

Porter and Drinker that Foster resigned or voluntarily resigned:

None of the material Foster has submitted to the court reflect a decision on the part of the Plans to terminate his employment, but Foster asserts that he received "notice of his termination as plan attorney" from his law partner Michael P. Mullen, and on September

19, 2012, sent resignation letters to the Plans. (Id. ¶ 69).  Mem. Opinion & Order, 9/30/18, doc 175 at p. 11.

Foster himself admits the resignation was voluntary, and there is no basis in the record for a conclusion that Principal Life was on notice that it was not. Id. p. 13

Foster has acknowledged that his resignation was voluntary but nevertheless insists that, absent Principal's Life's conduct, he would have continued as attorney for the Plan committees indefinitely. Id. p. 15.

As more fully explained there, it is undisputed that Foster resigned from his role as attorney for the plan committees in September 2012 and that his invoices up to that date have been paid, as part of the resolution of another lawsuit… Accordingly, Principal Life is not liable for the loss of Foster's income stream after September 2012.  October 15, 2018, Order & Statement, doc 177, p. 1-2.

153.    Pallmeyer accepts, adopts and restates Becker Porter and Drinker's misrepresentation of law to the court that a resignation while the employer is in breach of contract for non-payment of compensation is a resignation when it is a constructive discharge or declaration of breach of contract.

154.    Pallmeyer suppresses and rejects the Minutes of the Plan Committee Meetings entered into evidence establishing that the Plan Committees never received Foster's letters of resignation or any other communication from Foster that he was relinquishing his position as plan attorney; and also reflect that the Plan Committees treated the resolutions to pay Foster's outstanding bills as a final payment to Foster and termination of his contractual representation as plan attorney effective July 31, 2012.

155.    Pallmeyer falsely states to the court that Foster sent the resignation letters to the Plans when her own citation to the record ¶ 69 of Foster's Statement of Facts references to Foster's Declaration which states the resignation letters were "delivered to his attorney, Michael P. Mullen."  Declaration, ¶ 62, doc 126, 9/10/17 at p.11.

156.     There is no evidence on the record that Foster admitted he resigned voluntarily or otherwise communicated to the Plan Committees he was relinquishing his position as plan attorney; even the "Facts" section of Pallmeyer's opinion states that the settlement agreement contemplated Foster's resignation as counsel to the Plans only after his contracts were terminated by the Plan Committees' motion to pay his outstanding bills:

> Foster agrees that the settlement agreement contemplated his resignation as counsel for each of the Plans, after his contracts were terminated by the Plan Committees' motion to pay his outstanding bills. (Id. ¶ 50.)
> Mem. Opinion & Order 9/30/18, doc 175 at p. 10.

157.     The evidence on the record establishes that at all times Foster disputed that he resigned and further establishes that Foster was not paid through September 2012 - there were no invoices after July 31, 2012 - the only invoices existing and paid were from March 1, 2011 through July 31, 2012.

158.     Pallmeyer rejects her own Order of 9/29/16 implementing Foster I that entered summary judgement under Rule 12(d) that the settlement agreement is not a defense to Foster's claim against Principal; instead, Pallmeyer reinstates her original judgement vacated in Foster I that Foster's tort claim against Principal is defeated by the terms of the settlement agreement resolving the Pace litigation.  Mem. Opinion & Order, doc 175, 9/30/18, p. 16; October 15, 2018, Order & Statement, doc 177, p. 1-2.

### Pallmeyer's Judgement Was Entered without Subject Matter Jurisdiction

***Mandate Rule***

159.     *A. F. Moore & Associates Inc.,* 974 F. 3d 836 (7th Cir. 2020) in which Barrett was a member of the panel, describes a court order mandate as follows:

> One of the more common and appropriate uses of mandamus authority is to "keep a lower tribunal from interposing unauthorized obstructions to enforcement of a judgement of a higher court." *United States v. U.S. District Court*, 334 U.S. 258, 263-64; *In re Cont'l Ill.*

*Sec. Litig.,* 985 F. 2d 867, 869 (7th Cir. 1993); see also *In re Trade & Commerce Bank ex rel. Fisher*, 890 F. 3d 301,303 (D.C. Cir. 2018). We call this obligation to follow the judgement of a reviewing court the mandate rule, a relative of the law of the case. See Kovacs v. United States, 739 F. 3d 1020, 1024 (7th Cir. 2014). Under the mandate rule, "when a court of appeals has reversed a final judgement and remanded the case, the district court is required to comply with the express or implied rulings of the appellate court." *Moore v. Anderson*, 222 F. 3d 280, 283 (7th Cir. 2000). Said another way, the court must follow "the spirit as well as the letter of the mandate." *Cont'l Ill.*, 985 F. 2d at 869.
*A. F. Moore & Associates Inc.*, 974 F. 3d 836, 839-840 (7th Cir. 2020).

160.    Easterbrook wrote the opinion in the second appeal of the *Baez-Sanchez* case,

where he stated:

> We have never before encountered defiance of a remand order, and we hope to never see it again. Members of the Board must count themselves lucky that Baez-Sanchez has not asked us to hold them in contempt, with all the consequences that possibility entails… The Attorney General, the Secretary, and the Board are free to maintain, in some other case, that our decision is mistaken – though it has been followed elsewhere, see *Meridor v. Attorney General*, 891 F. 3d 1302, 1307 & n. 8 (11th Cir. 2018). But they are not free to disregard our mandate in the very case making the decision. That much, at least, is well established, not only in *Plaut* but also in many other cases. See e. g. *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 104 S. Ct. 575, 78 L. Ed. 2d 388 (1984).
> *Baez-Sanchez v. Barr,* 947 F. 3d at 1035-1036.

161.    The jurisdictional scope on remand is determined from the opinion as a whole; if

the opinion identifies a discrete, particular error that can be corrected on remand without the

determination of other issues, then the district court is limited to correcting that error. *United*

*States v. Parker*, 101 F. 3d 527, 528 (7th Cir. 1996).

162.    "The district court was powerless to reconsider our decision on this matter and grant

what we had withheld." *A. F. Moore & Associates Inc.*, supra, at 940.

163.    Federal court jurisdiction is limited to the resolution of "Cases" and

"Controversies" U.S. Constitution, art. III, § 2, cl. 1; to qualify as a case fit for federal court

adjudication, an actual controversy must be extant at all stages of review, not merely at the time

the complaint is filed, *Arizonians for Official English v. Arizona*, 520 U. S. 43, 67 (1997).

164.    Subject matter jurisdiction was present in the district court on remand only because Foster I preserved an actual controversy by not applying the settlement with Pace as a defense to Foster's claim.

165.    In compliance with the mandate court order in Foster I, Pallmeyer entered summary judgement on remand under Rule 12(d) that as a matter of law the settlement agreement between Foster and Pace is not a defense to Foster's claim against Principal.

166.    Subject matter jurisdiction on remand prohibits Pallmeyer from reinstating her original judgement, vacated in Foster I, that there is no claim (controversy) upon which relief can be granted.

### *Res Judicata*

167.    A dismissal with prejudice based on a defense to the claim operates as a final adjudication on the merits for purposes of the doctrine of res judicata (claim preclusion). *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 506 (2001); *Hudson v. City of Chicago*, 889 N.E. 2d 210, 215 (Illinois Supreme Court 2008).

168.    Res Judicata applies to defenses as well as to claims; it is well settled that a cause of action includes defenses offered against the claim; a defendant may not re-litigate a defense. *Schlangen v. Resolution Trust Corp.*, 934 F. 2d 143, 147 (7th Cir.1991).

169.    Defensive res judicata must be applied when the judgement in the second action would nullify, impair or destroy rights or interests established in the first action. *Lucky Brand Dungarees Inc. v. Marcel Fashions Group Inc.*, United States Supreme Court Slip Opinion (No. 18-1086, May 14, 2020) p.8 and 10.

170.    Res Judicata is a jurisdictional limitation on the court's power as it compels judgement in accordance with the doctrine. *Evans v. City of Chicago*, 873 F. 2d 1007, 1014 (7th Cir. 1989).

171.    Res Judicata is not a mere practice or procedure, but a rule of fundamental and substantial justice, of public policy and private peace which must be enforced by the courts; there simply is no principle of law or equity that sanctions a federal court to reject res judicata. *Federated Department Stores, Inc. v. Moite,* 452 U.S. 394, 401 (1981).

172.    Foster I is res judicata that the settlement agreement between Foster and Pace is not a defense to Foster's claim against Principal.

173.    Pallmeyer applied the compulsory and jurisdictional doctrine of res judicata by entering summary judgement under Rule 12(d) that as a matter of law the settlement agreement between Foster and Pace is not a defense to Foster's claim against Principal.

174.    The compulsory and jurisdictional doctrine of res judicata prohibits Pallmeyer from reinstating her original judgement, vacated in Foster I. that there is no claim (controversy) upon which relief can be granted.

### Foster II Appeal # 18-3215

175.    Barrett Brennan and Easterbrook were the panel in Foster II.

176.    Becker and McDermott continued Becker Porter and Drinker's disobedience of the court order mandate in Foster I to deceive the court as described in this Complaint.

177.    Becker and McDermott repeated to the court the false statements of Becker Porter and Drinker on the March 2005 e-mail as described in this Complaint.  Principal's Brief at 7 and 39.

178.     Becker and McDermott repeated to the court the false statements initiated by Becker Porter and Drinker that Foster resigned or voluntarily resigned. Principal's Brief at 12, 14, 15, 16, 19, 22, 23, 24, 25, 26, 27, 28, 29, 32, 34, 35, 36, and 37.

179.     Foster continued objecting to the admission of the settlement agreement into evidence. Brief 29-30; Reply Brief 4.

180.     Foster presented to the court the evidence on the record establishing the March 2005 e-mail was to ABN AMRO Trust Services and not Principal; the Service & Expense Agreements did not exist until 2007; and any "instructions" to Principal must be from the Plan Committees who are the Parties to the Agreement and not from Joseph Ellyin who merely executed the Agreements on behalf of the Plan Committees. Brief 15-18, Reply Brief 7-10.

181.     Foster presented to the court the evidence on the record establishing that Foster never resigned and even if Foster did resign it would be a constructive discharge or declaration of breach of contract. Foster's Brief, 30-36; Reply Brief 3-5.

182.     Foster presented to the court that Foster I's decision that Foster's tort claim against Principal is not precluded by the terms of the settlement agreement with Pace and is the law of this case and res judicata.  Foster's Brief, 30-31; Reply Brief 3-4.

183.     At oral argument, Foster attempted to argue his case, but he was required to address the panel's obsession with the settlement agreement between Foster and Pace:

> THE PANEL:  And that payment was a result of the resignations, correct? Transcript of Oral Argument. 4:18-19.
>
> MR. FOSTER: There was no resignations. It was based on – the Plan Committees terminated me as of July 31st. 4:20-22
>
> THE PANEL:  I thought the resignation was part of the settlement. Are you now denying that you resigned? 4:23-24; 5:1.
>
> MR. FOSTER: I've resigned – I denied in my brief that I resigned.  I've always – 5:2-3.

THE PANEL: What about the – 5:4-5.

MR. FOSTER: Your honor, this is important. That resignation was part of the settlement agreement, but it was never – I never delivered a resignation to the Plan Committees. The Plan Committees were my employers. 5:5-9.

THE PANEL: So is that not part of the settlement agreement, your resignation? 5:10-11.

MR. FOSTER: The Plan Committees – the Plan Committees were not part of the settlement agreement. The settlement agreement was between me and Pace. The Plan Committees were not part of that. 5:12-16.

THE PANEL: And did the settlement agreement include a provision requiring you to resign in part in exchange for the settlement? 5:17-19.

MR. FOSTER: The settlement agreement provided that I would resign after the Plan Committees paid all my bills up till July 31st. 5:20-22

THE PANEL: And they did pay all your bills? 5:23.

MR. FOSTER: And they did pay all my bills. And they terminated me. That was a termination by the Plan Committee. The settlement agreement provided that I would resign after the Plan Committees terminated me. 5:24; 6:1-4.

184.    At oral argument, Foster asserted that the settlement agreement between Foster and Pace should not have been admitted into evidence and informed Barrett, Brennan and Easterbrook that the case had been before the Seventh Circuit Court of Appeals where the Court held the settlement agreement between Foster and Pace was not a bar to Foster seeking recovery against Principal.

MR. FOSTER: You know, Your Honor, the settlement agreement shouldn't have even been admitted under Section 408 of the federal rules. The settlement agreement was with a third party. I was - - this - - you have to distinguish between the parties here. There is a Plan Committee, and that was my employer, and then there's PACE who's telling - - Transcript of Oral Argument, 7:10-17.

THE PANEL: Did you make an argument based on Rule 408 in your brief? Id. 7:18-19.

MR. FOSTER: Yes, of course. And I did it at the lower level too. And I also pointed out, you know, this was – this was in the Seventh Circuit before, you know. Are you aware of that? That this case was in the Seventh Circuit? Id. 7:20:24.

THE PANEL: You don't get to cross – examine the judges. Id. 8:1-2.

MR. FOSTER: I'm sorry. I'm sorry. Apologize. Id. 8:3.

But anyways, in that case the court ruled that the settlement was no bar to my seeking recovery against Principal. Id. 8:4-6.

185.     Barrett Brennan and Easterbrook falsely stated to the court that Foster put the settlement agreement at issue, Foster II, p. 6, when all of the evidence on the record establishes that Principal put the settlement agreement at issue by entering it into evidence in its motion and then after losing that motion, raised it again as a defense in their answer to Foster's Second Amended Complaint.

186.     Barrett Brennan and Easterbrook disobeyed the court order mandate in Foster I and deceived the court by allowing the settlement agreement into evidence when Foster I held the settlement agreement did not preclude Foster's claim against Principal.

187.     Barrett Brennan and Easterbrook accepted, adopted and restated to the court the false statements of Pallmeyer and the Defendants as described in this Complaint regarding the March 2005 e-mail:

In 2005, Principal received an email from Ellyin directing payment of Foster's fees at a fixed rate "until direction from [Ellyin] to the contrary." Foster then received regular payments from Principal until March 2011. Foster I, p. 2.

188.     Barrett Brennan and Easterbrook suppressed and rejected the evidence on the record proving the March 2005 e-mail was to ABN AMRO and not Principal as set forth in Foster's Brief, 15-18 and Reply Brief 7-8 captioned: **A. The March 5, 2011 e-mail to ABN AMRO (not Principal) was a mere confirmation of the monthly payment amounts.**

189.    Barrett Brennan and Easterbrook accepted, adopted and restated to the court the false statements of Defendants and Pallmeyer that Ellyin was a plan/committee representative under the Service and Expense Agreements:

> Foster presumes that because Principal wrongfully implemented Pace's unauthorized stop-payment order against him, he must be entitled to relief for that interference. He is mistaken. Foster must furnish evidence of all four elements to succeed on his intentional interference claim. *See Voyles*, 751 N.E. 2d at 1133-34. And, in any event, the record does not show that Principal committed "some impropriety" intending to interfere with Foster's business dealings. *See Romanek v. Connelly*, 753 N.E. 2d 1062, 1073 (Ill. App. Ct 2001). When Principal implemented Pace's stop-payment order, it was in a difficult situation: as the plans' paying agent, it had to decide whether to release Foster's payment based on contradictory orders from feuding parties. It ultimately made the reasonable decision to defer to its contractual obligations and follow the directions of the committee representative, who happened to be a Pace employee. See *Atanus v. Am. Airlines, Inc*., 932 N.E. 2d 1044, 1051 (Ill. App. Ct. 2010). Under those circumstances, no reasonable juror could find that Principal's decision was intended to sabotage Foster's relationships with the plans. Foster II, p. 5.

190.    Barrett Brennan and Easterbrook admit Principal wrongfully implemented Pace's unauthorized stop-payment order against Foster, but state such action is not an "impropriety" even though Principal's wrongful implementation of Pace's unauthorized stop payment order meets the definition of theft under the Illinois Criminal Code, 720 ILCS 5/16-1(a): "exerts unauthorized control over the property of another."

191.    Barret Brennan and Easterbrook misrepresents the law to the court that a person has the right to follow a directive from a "committee representative" after receiving notice that the directive was not authorized by the committee.

192.    Barrett Brennan and Easterbrook falsely stated to the court that Principal is the paying agent of the plans when it is undisputed that Principal is the paying agent of the Plan Committees. Principal Resp. [146] ¶ 36.

193.    Barrett Brennan and Easterbrook falsely stated to the court that there were contradictory orders from feuding parties when their own "undisputed facts and the summary judgment record" indicates the only orders to Principal were from Pace:

> From March 2011 to July 2012, Ellyin and other Pace representatives instructed Principal not to pay Foster's invoices, though Foster continued to serve as counsel for the plans. Foster II, p. 2.

194.    Barrett Brennan and Easterbrook suppressed and rejected the documentary evidence on the record establishing that the Plan Committees were both the Plan Representative and Party to the Service and Expense Agreements as set forth in Foster's Brief 15-18 and Reply Brief 7-10 captioned as follows: **III. ELLYIN WAS NEVER APPOINTED PLAN REPRESENTATIVE UNDER THE SERVICE AND EXPENSE AGREEMENTS – HE MERELY EXECUTED THE AGREEMENTS,** instead, they accepted, adopted and restated Pallmeyer and Defendants' false statements made to the court that Principal must follow the directions of Ellyin as a committee representative or plan representative under the Service and Expense Agreements.

195.    Barrett, Brennan and Easterbrook accepted, adopted and restated to the court the false statements of Defendants and Pallmeyer as described in this Complaint that Foster resigned:

> Nor did Principal's decision have that effect. Foster's business relationship (and any possible expected future income) ended because Foster voluntarily resigned as counsel for the plans. See *Cashman*, 441 N.E. 2d at 944 (holding that voluntary resignation exterminates expectation of continued employment "as a matter of law"). Despite Foster's assertions to the contrary, he resigned voluntarily; the express provisions in the settlement agreement with Pace, Foster's resignation letters and his own statements at a deposition and at oral argument of this appeal so demonstrate. Because Principal – who played no role in the settlement negotiations between Foster and Pace – could not have caused Foster's loss of future income, Foster cannot recover damages from Principal. Foster II, p. 5.

196.    Barrett Brennan and Easterbrook accepted, adopted and restated to the court the misrepresentation of law by Defendants and Pallmeyer that a resignation while the employer is in

breach of contract for non-payment of compensation is a resignation when such a resignation is a constructive discharge or declaration of breach of contract.

197.    Barrett, Brennan and Easterbrook misrepresented to the court the holding in the *Cashman* case which had nothing to do with a voluntary resignation – the resignation was procured by fraud [some of the directors told plaintiff his resignation was being requested by savings and loan regulatory officials when that was not true]; the "matter of law" reference in *Cashman* referred to the fact that all of the directors, except Plaintiff, had agreed to fire him if he did not resign, thus, the necessary expectation for the continuation of plaintiff's position as president was negated as a "matter of law." *Cashman v. Shinn*, 441 N.E. 2d 940, 943-944 (Ill. App. Ct. 1982).

198.    Barrett, Brennan and Easterbrook suppressed and rejected the evidence on the record establishing that Foster never resigned as set forth in Foster's Brief 29-33 and Reply Brief 2-4 quoted below:

**B.    Foster's Letters of Resignation were executed after the Plan Committees terminated his representation and were never delivered to the Plan Committees.**

There is no requirement to use the words you are fired or terminated. *Hinthorn v. Roland's of Bloomington, Inc.,* 119 Ill. 526 at 531 519 N.E. 2d 909 (1988).  Foster's proof of termination by the Plan Committees is deduced from the fact that after the motion to pay bills each Pace Plan Committee noted, discussed, motioned or hired a replacement attorney:

| PLAN | MOTION to Pay Date | DATE | STATEMENT OR ACTION IN MINUTES |
|---|---|---|---|
| North Shore | 8/10/12 | 8/10/12 | It was noted that new counsel would be necessary. Foster Statement [125] ¶¶ 59-69, Exhibit A-13 [127-14] 25 |
| River | 8/2/12 | 9/14/12 | There was a discussion with respect to naming a Replacement Plan attorney. *Id.* 22 |
| 1028 | 9/7/12 | 12/5/12 | A motion was made by Melinda Metzger to appoint Tom Paravola as the new Plan Attorney. *Id.* 8. |
| Heritage | 8/13/12 | 12/14/12 | Tom Paravola was appointed the new plan attorney. *Id.* 15. |

| Southwest | 8/10/12 | | 11/12/12 | Mark Klafeta, Pace Plan Committee Member states that he would like to have "an attorney" review the documents for Willshire services. *Id.* 18. |
|---|---|---|---|---|

North Shore and River Plan Committees are noting and discussing a replacement attorney prior to the existence of Foster's resignation executed and effective on September 19, 2012. At the meeting following the motion to pay bills, the 1028 Plan Committee made a motion to hire a replacement attorney, Heritage's Plan Committee hired a new attorney and the Southwest Plan Committee acknowledged the need for an attorney. Darrell Washington of Principal was present at all of the meetings. There is no rationale argument that the Pace Plan Committees would note, discuss, motion or hire a replacement attorney if Foster was not terminated previously by the motion to pay bills resolutions.

Principal cannot prove a resignation as there is no proof that Foster delivered the letters of resignation to the Pace Plan Committees. The resignation takes effect not when the employee signs the letter of resignation but when the employee communicates to the employer in writing or otherwise, an intent to unconditionally relinquish the position. *Rohrback v. Ill. Dept. of Employment SEC.*, 835 N.E. 2d 955, 962: 361 Ill. App.3d 298 (2005). Foster testified that he never delivered the letters to the Pace Plan Committees. Foster's Deposition doc 146-1, 174:8-10; 175:10-24; 185:16-22. A resignation must be received by the proper authority, in this case, the Plan Committees. *Weber v. Bd. of Fire & Police Com.* 562 N.E. 2d 318, 320, 204 Ill. App. 3d 358 (1990). Accordingly, receipt of the resignations would have to be acknowledged in the minutes of the respective Plan Committee meeting, which did not occur.

## C. A resignation that does not exist cannot be created from the Terms of the Settlement Agreement.

The Pace Plan Committees were not parties to the confidential settlement agreement between Foster and Pace and the Pace employee defendants.

Principal uses the terms of the settlement agreement as evidence that Foster resigned and claims that such resignation eliminated liability after July 31, 2012. However, Principal waived that argument. *Milligan v. Bd. Of Trustees of S. Ill. Univ.*, 686 F. 3d 378, 386 (7th Cir. 2012). The Appellate Court specifically held there is no indication that Principal was somehow released by the terms of the settlement agreement and Foster's "claim is not precluded by his settlement with Pace and Pace employees." *Foster v. Principal* 806 F.3d 967, 973-974. The Appellate Court's holding is an adjudication upon the merits under Federal Rule of Civil Procedure 41(b). *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 506 (2001). Under the doctrine of Res Judicata (known as Law of the Case with a preliminary but final order on the merits between the parties), Principal cannot claim liability is eliminated because of a term in the settlement agreement. Id, 506.

Using terms in the settlement agreement as evidence against Foster to eliminate Foster's claim violates Rule 408, Federal Rule of Evidence and also Local Rule 83.5 that addresses alternate dispute proceedings, which is applicable in this case as the settlement arises from

a mediation proceeding before Magistrate Judge Young B. Kim. Local Rule 83.5 has the same force and effect as Rule 408, since it is mandated by statute: 28 U.S C. § 652(d). Foster objected to the admissibility of the settlement agreement. Mem. & Order of 9/29/16 [106], 8 and he also objected in his Deposition. Foster Dep. [146-1], 178:17-22. Pace's attorney objected to questions on the settlement agreement based on the confidentiality clause. Ellyin Dep. [145-2] 65:18-24.

199. Barrett, Brennan and Easterbrook admitted that Foster disputed ("Despite Foster's assertions to the contrary") the material fact that he resigned, Foster II, p. 5; such admission precluded Barrett, Brennan and Easterbrook from affirming Pallmeyer's summary judgement in favor of Principal:

**Rule 56. Summary Judgement**

(a) MOTION FOR SUMMARY JUDGEMENT OR PARTIAL SUMMARY JUDGEMENT. A Party may move for summary judgement, identifying each claim or defense---or the part of each claim or defense---on which summary judgement is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law. The court should state on the record the reasons for granting or denying the motion.

200. The express provisions in the confidential settlement agreement between Foster and Pace is not a resignation as there is no communication to the Plan Committee employers that Foster is relinquishing his position as plan attorney.

201. Foster's resignation letters, which the evidence on the record establishes were never delivered to the Plan Committees, are not resignations as there is no communication to the Plan Committee employers that Foster is relinquishing his position as plan attorney.

202. All of the evidence on the record establishes that Foster did not otherwise resign by communicating to his Plan Committee employers that he is relinquishing his position as plan attorney.

203. Barrett, Brennan and Easterbrook, acting in the capacity of witnesses, falsely testified to the court that Foster made statements in his deposition that demonstrate he resigned

49

voluntarily when the transcript of Foster's deposition [146-1] entered into the evidence on the record reveals that no such statements exist.

204.    Barrett, Brennan and Easterbrook, acting in the capacity of witnesses, falsely testified to the court that Foster's own statements at oral argument demonstrate that he resigned voluntarily, when the transcript of oral argument reveals that no such statements exist. Transcript of Oral Argument has been entered into the court record, 20-1262, Motion to Apply Operating Procedure 6, doc 7, Exhibit B; 20-1884, Mandamus Petition, doc 1, Exhibit D.

205.    Barrett Brennan and Easterbrook affirmed Pallmeyer's summary judgement in favor of Principal by making findings of fact based on their own false hearsay testimony to the court.

206.    By making findings of fact, Barrett Brennan and Easterbrook violated summary judgement procedure and denied Foster his right to a trial by jury under the Seventh Amendment of the U.S. Constitution: the purpose of summary judgement procedure is not to make findings of fact, but to determine whether factual issues exist. *Cashman v. Shinn,* 441 N.E. 2d 940, 942 (Ill App. Ct. 1982); at the summary judgement stage: the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247 (1986),

207.    Barrett Brennan and Easterbrook flagrantly disobeyed the court order mandate in Foster I:

> Because Principal – who played no role in the settlement negotiations between Foster and Pace – could not have caused Foster's loss of future income, Foster cannot recover damages from Principal.  Foster II, p.5.

**Barrett Brennan and Easterbrook Acted Without Any Jurisdiction in Foster II #18-3215.**

208.    If the issues were decided either expressly or by necessary implication, those determinations of law will be binding on remand not only in the district court, but in a subsequent appeal. *Parts & Electric Motors Inc. v. Sterling Electric Inc.*, 866 F. 2d 228, 232 (7th Cir. 1989).

209.    Barrett Brennan and Easterbrook must act only within subject matter jurisdiction on remand.

210.    Subject matter jurisdiction on remand defined by the Foster I opinion and mandate prohibits reinstatement of Pallmeyer's original judgement vacated in Foster I; and such action is also prohibited by the compulsory jurisdictional doctrine of res judicata.

211.    After the briefs are filed in an appeal in the Seventh Circuit Court of Appeals, the case is assigned to a three judge panel (merits panel) that has jurisdiction of the case to decide the merits of the case.

212.    Circuit court judges Bauer, Kanne and Rovner decided the first appeal.

213.    Barrett, Brennan and Easterbrook acknowledge the first appeal in Foster II:

In Foster's first appeal, this court vacated that judgement and remanded the case, holding that Foster had adequately pleaded a tortious-interference claim. *See Foster v. Principal Life Ins. Co.,* 806 F.3d 967, 974 (7th Cir. 2015). Foster II, p. 3.

214.     Operating Procedure 6 of the Seventh Circuit Court of Appeals provides that briefs in a subsequent appeal in a case in which the court has heard an earlier appeal will be sent to the panel that heard the first appeal and that panel will decide the successive appeal on the merits.

215.    Only when the issues are different and matters of judicial economy are present can the panel in the first appeal elect not to retain jurisdiction of the second appeal. Operating Procedure 6.

216.    The issues presented in Foster II were identical to the issues presented in Foster I.

217. A wrongful or mistaken assignment of a case to a different panel of circuit judges does not confer jurisdiction on that panel.

218. Barrett, Brennan and Easterbrook misrepresented to the court that they had jurisdiction of the appeal.

219. Barrack Brennan and Easterbrook without having jurisdiction of the appeal and without subject matter jurisdiction on remand in the district court affirmed Pallmeyer's judgement.

### Appeal of Foster's Rule 60(b)(4) Motion # 20-1262

220. On January 15, 2020, Foster filed a Rule 60(b)(4) motion that the district court judgement as affirmed in Foster II is void for lack of subject matter jurisdiction and for violations of Foster's constitutional right to due process of law.

221. Pallmeyer denied the motion on January 23, 2020.

222. Foster filed an appeal that was docketed on February 14, 2020, # 20-1262.

223. In addition to a merits panel, the Seventh Circuit Court of Appeals maintains a motion panel which has jurisdiction to rule on any motions presented to the court before the case is assigned to a merits panel.

224. On March 9, 2020, Foster filed a motion to have circuit judges Bauer, Kanne, and Rovner, the Foster I panel, assigned to the appeal of the district court's denial of the Rule 60(b)(4) motion, and in any event circuit judges Barrett, Brennan and Easterbrook must be disqualified from random selection to the merits panel; Foster stated in the motion as follows:

1. In a subsequent appeal of a case in which the Court heard an earlier appeal, the second appeal will be sent to the panel that heard the first appeal who will decide the successive appeal on the merits unless there is no overlap in the issues presented. Operating Procedure 6, of the 7th Circuit Court of Appeals. Though the issues were identical, a new judicial panel of different judges held oral argument on July 10, 2019 and then rushed to judgement twelve days later (July 22, 2019). If courts are to require others to follow procedures, courts must do so as well; a court cannot treat a case differently than others. *Hollingsworth v. Perry*, 558 U.S. 183, 199 (2010).

2.  This case could have waited until the original panel in the First Appeal was available. In fact, Foster did not contest a 30 day extension for defense counsel to file his brief and defense counsel filed a lengthy schedule with the Court indicating dates when he would not be available for oral argument.  Although defense counsel's need for additional time and lengthy schedule were accommodated, mysteriously, Operating Procedure 6, an important and fundamental procedure was circumvented.

3.  On February 18, 2020, Foster called the office of the clerk of the court.  Such office indicated it did not know why Operating Procedure No. 6 was not applied to the successive appeal in in this case.

4.   Failing to apply Operating Procedure 6 results in two Court decisions that are diametrically opposed to each other and a Third Appeal to declare the judgement in the Second Appeal void:

5.  Failure to apply Operating Rule 6 has precedent. *How Frank Easterbrook Kept George Ryan in Prison,* Albert W. Alschuler, Professor Emeritus, University of Chicago, Valparaiso University Law Review, Volume 50, Num. 1.  In the second appeal of former Governor Ryan's case, only one of the judges was on the first appeal. Judge Frank Easterbrook emerged as one of the panel judges and his selection was not random. Id. p. 8, 39.  The district court judge in that case is the same as in this case, Judge Rebecca Pallmeyer.

6.  Frank Easterbrook is one of the judges on the new panel in Foster's Second Appeal. According to the above author, Judge Easterbrook "persistently presents wildly inaccurate, made up statements as unquestionable statements of fact." Id. p. 15.  This has also been the subject of another article: Pattern of misstated facts found in Opinion of Renowned U.S. Judge Easterbrook, Emily Hoerner and Rick Tulsky, April 4, 2017. InjusticeWatch:www.injusticewatch.org/projects/2017/pattern-of-misstated-facts-found-in-probe-of-renowned-federal-judge-opinions/

7.   There is an appearance that the panel in Foster's Second Appeal was improperly assembled to avoid the panel in the First Appeal that held Foster's claim is not precluded by his settlement with Pace: [Foster quotes from Foster I the same passages as in ¶ 45 of this Complaint].

8.  Unlike the Second Appeal panel, the First Appeal panel would have followed the "law of remand" which is essentially the application of res judicata.  When a case is remanded, an appeal taken from judgement entered on remand is limited to issues that could not have been raised in the prior appeal; a defendant "cannot use the accident of a remand to raise in a second appeal an issue that he could just as well have raised in the first appeal." *U.S. v. Peel*, 668 F. 3d 506, 507 (7th Cir. 2012) quoting from *United States v. Parker,* 101 F. 3d 527, 528 (7th Cir. 1996).  Rearguing issues decided in the first appeal or presenting arguments that could have but were not made in the first appeal constitutes an untimely petition to rehear the decision rendered in the first appeal. *U.S. v. Peel* at 507.

9.  Failure to have not even one of the panel members from the First Appeal; the similarities to the *Ryan* case, namely, the inexplicable emergence of Judge Frank Easterbrook and the same district court judge; the above cited articles on Judge Easterbrook; defense counsel's request for an extension to file his brief and the accommodation of his schedule; the rush to judgement only twelve days after oral argument; and the panel's failure to follow the "law of remand" requires that the members of the panel on the Second Appeal  (Circuit Judges: Easterbrook, Barrett and Brennan) be disqualified from hearing this appeal to preserve impartiality and the appearance thereof required by the due process clause in the Fifth Amendment.

10.  For the foregoing reasons Operating Procedure 6 should be applied so that the panel that heard the First Appeal (Circuit Judges: Bauer, Kanne and Rovner) should hear this appeal, but, in any event the panel members on the Second Appeal (Circuit Judges: Easterbrook, Barrett and Brennan) should be disqualified from hearing this appeal.

The above quoted paragraphs are from Foster's March 9, 2020 Motion, Doc 7.

225.    On March 11, 2020, the motion was denied stating that no panel has yet been assigned and a panel will be assigned after briefing is completed. Doc. 8.

226.    On March 23, 2020, Becker and McDermott filed a motion to dismiss the appeal stating that Foster is only appealing one of the several arguments presented to the district court in his Rule 60(b)(4) motion:

Foster asserted several arguments, only one of which he appeals here. Principal's Motion to Dismiss Foster's Appeal, Doc. 9, at p. 8.

227.    On March 24, 2020, Foster filed his Brief that presented the following arguments to the Seventh Circuit Court of Appeals:

I. The judgement is void because subject matter jurisdiction cannot be attacked collaterally.

II. The judgement is void for exceeding the court's jurisdictional powers and violating due process of law by failing to apply res judicata and related doctrines.

III. Admission of the third party settlement agreement voids the judgement for violating due process of law and exceeding the court's jurisdiction.

IV. Treating Foster's case differently from other cases by not applying Operating Procedure 6 voids the order for want of due process.

V. Due process requires judgement based on the truth and not Principal's false statements.

VI. Due process requires that summary judgement procedure be followed. Failure to do so violated due process and denied Foster his right to a trial by jury under the seventh amendment.

VII. The Order is void for violating Foster's 5th amendment liberty of contract and 13th amendment rights.

VIII. Due process requires a stated reason for the judgement; failure to state a reason voids the Order.

IX. Due process requires a fair and impartial tribunal which did not occur.

X. Following due process and summary judgement procedures would have compelled judgement in favor of Foster.

Doc 11.

228.    On March 25, 2020, the court orders Foster to respond to Principal's motion to dismiss the appeal on or before April 1, 2020. Doc 12.

229.    On March 26, 2020, Becker and McDermott filed a motion to suspend the filing of any further briefs. Doc 13.

230.    On the same day, March 26, 2020, the court granted the motion to suspend the filing of any further briefs until resolution of Principal's motion to dismiss. Doc 14.

231.    On March 27, 2020, Foster filed a Response to the motion to suspend the filing of further briefs asserting that the motion to dismiss the appeal should be denied, because Principal is acting in the capacity of both the appellant and appellee by stating that Foster is appealing only one of his several arguments raised in his Rule 60(b)(4) motion; further, there is no need to engage in motion practice as the opportunity to be heard belongs in the briefs, citing Easterbrook in the case of *In the matter of Lisse,* 905 F. 3d 495, 497 (2018). Doc 15.

232.    The court never ruled on Foster's March 27, 2020 Response.

233.    On March 31, 2020, Foster responded to the one argument selected by Principal in its motion to dismiss the appeal, but further asserted that Foster's other arguments attacking the district court judgement as void must be heard and addressed in the briefs in accordance with due process of law. Doc 17, p.1-3.

234.    Foster informed the court in his March 31, 2020 Response that subject matter jurisdiction at the time the complaint is filed is not the same as subject matter jurisdiction on remand:

> Foster I had but two choices.  Dismiss the claim on the merits that the settlement with Pace bars Foster's claim for damages or hold the settlement with Pace does not preclude Foster's claim. If the complaint was dismissed, Principal wins and there is no remand.  If Foster wins, there is a remand.  Because of this sink or swim situation, subject matter jurisdiction on remand in the district court only exists if Foster prevailed on the merits that the settlement with Pace did not negate his damages which are in excess of $75,000.
> Doc 17, p. 6

235.    On April 8, 2020, the following order was entered:

> Upon review of the parties' filings on the motion to dismiss, the short record, and the appellant's opening brief, IT IS ORDERED that the judgement of the district court is SUMMARILY AFFIRMED.  The appellant's primary argument treats a decision on the merits as retroactively defeating subject-matter jurisdiction.  That approach is inconsistent with *Bell v. Hood*, 327 U.S. 678 (1946), and *Johnson v. Wattenbarger*, 361 F. 3d 991 (7th Cir. 2004).  His remaining arguments reflect disagreement with the court's decision of July 2019 in the prior appeal, and a motion under Fed. R. Civ. P. 60(b) is not a proper means to contest an appellate decision. Frank H. Easterbrook, Circuit Judge; Amy C. Barrett, Circuit Judge; and Michael B. Brennan, Circuit Judge.  Doc 19.

236.    The three judge motion panel is rotated among the judges on a weekly basis, [7th Circuit Practitioners handbook at p. 13].

237    The motion panel on the date the motion is filed has jurisdiction to rule on the motion:

> Motions filed during a panel's week stay with that panel, even if a request for a response means that the case is not ready for submission until the panel has changed.  This ensures that neither counsel nor any judge can manipulate the assignment system.  Effectively locking a case to a panel by the date the motion is filed means that the process produces a

random distribution of assignments over the year. (Counsel don't know who is on that week's panel or who will be on the next week's, so they can't time their motions to produce assignment to as[a] particular panel.).

*Judge Easterbrook Responds* by Ed Whelan, National Review, December 2, 2014. https://www.nationalreview.com/bench-memos/judge-easterbrook-responds-ed-whelan/

238.    On March 23, 2020, the filing date of the motion to dismiss the appeal, the motion panel was not Barrett Brennan and Easterbrook. [A 7th Circuit Court Order entered on March 25, 2020, **Exhibit A**, granting a motion filed on March 23, 2020 indicates Brennan, Manion and Scudder were the motion panel on March 23, 2020.]

239.    Barrett Brennan and Easterbrook usurped the jurisdiction of the motion panel, misrepresented to the court that they had jurisdiction and without jurisdiction entered the April 8, 2020 order granting Principal's motion to dismiss the appeal by summarily affirming Pallmeyer's denial of the Rule 60(b)(4) motion.

### Foster's Petition for a Writ of Mandamus # 20-1884

240.    A petition for writ of mandamus is under the jurisdiction of the Seventh Circuit motion panel on the date the petition is filed; that panel will decide whether to grant or deny the petition unless the motion panel determines oral argument is necessary, then the petition will either be retained by the motion panel or assigned to a merits panel. Operating Procedure 6; *A. F. Moore & Associates*, 974 F. 3d 836 (7th Cir. 2020) footnote at p. 842.

241.    Foster filed a petition for a writ of mandamus on May 27, 2020 with the Seventh Circuit Court of Appeals to enforce the Foster I mandate on the following grounds:

I. Admitting the third party settlement agreement into evidence irretrievably disobeyed the mandate in Foster I.

II. The mandate in Foster I decided the issue whether Foster's claim was precluded by his settlement with Pace.

III. The courts pursued a non-existent fact and a non-existent legal theory that served no other purpose than to disobey the Foster I mandate.

IV. Foster I mandate is res judicata.

242.    In his mandamus petition, Foster described the conduct of Barrett, Brennan and Easterbrook in granting Principal's motion to dismiss the Rule 60(b)(4) appeal:

> Without any jurisdiction, on April 8, 2020, the Foster II panel of Circuit Judges Easterbrook, Barrett and Brennan wrongfully intervened in Foster's appeal of his Rule 60(b)(4) motion and granted Principal's motion to dismiss the appeal by entering an order "Summarily Affirming" the district court's denial of the motion.  Order [19] included in **Exhibit E** attached hereto.  This prevented the 7th Circuit Court of Appeals judicial machinery from performing in the usual manner its impartial task of adjudging cases that are presented for adjudication.  Such conduct by the panel of judges and Principal's attorneys, who are all officers of the court, meets the definition of fraud on the court as set forth in *Kenner v. C. I. R.* 387 F. 2d 689, 691 (7th Cir. 1968).  This interference runs deep into the judicial machinery of the 7th Circuit as the motion panel was complicit in allowing the Foster II panel members to intervene. Petition for writ of mandamus, doc 1-1, p. 5-6.

> Now, there is not only the appearance of bias against Foster, but the appearance, if not circumstantial evidence, of collusion between Principal's attorneys and the Foster II panel of judges.  Since "Justice must satisfy the appearance of justice", *Offutt v. United States*, 348 U.S. 11, 14 (1954), the panel of judges in Foster II must be disqualified from taking any further action in this case including this mandamus petition.  They are also disqualified because the United States system of law will not allow a judge to try his own conduct. *In Re Murchison et al.* 349 U.S. 133, 137 (1955). Id. p. 6.

243.    On May 29, 2020, the following order is entered:

> The petition is DENIED. The petitioner is CAUTIONED that future filings seeking to relitigate these issues may result in the imposition of sanctions. Frank H. Easterbrook, Circuit Judge; Amy C. Barrett, Circuit Judge and Michael B. Brennan, Circuit Judge.

244.    The motion panel that had jurisdiction of Foster's petition for a writ of mandamus filed on May 27, 2020 was not Barrett Brennan and Easterbrook. [A 7th Circuit Court Order, also entered on May 29, 2020, **Exhibit B**, granting a motion filed on May 27, 2020 indicates Easterbrook, Sykes and St. Eve were the motion panel on May 27, 2020].

245.    Once again, Barrett Brennan and Easterbrook usurped the motion panel's jurisdiction; misrepresented to the court that they have jurisdiction and without jurisdiction denied Foster's petition for a writ of mandamus.

## COUNT 1

## SET ASIDE JUDGEMENT FOR FRAUD ON THE COURT

As to Defendant Principal, Plaintiff alleges as follows:

246.    Foster re-alleges and incorporates by reference the above paragraphs in this Complaint.

247.    Foster I vacated the district court's judgement that Foster's settlement with Pace barred Foster's claim against Principal; adjudicated that Foster's complaint set forth a valid tort claim against Principal; and remanded the case back to the district court for further proceedings consistent with its opinion and mandate to further adjudicate whether the evidence presented in the remand proceeding proves by a preponderance of the evidence the allegations set forth in Foster's complaint.

248.    Being a party to a lawsuit does not estop that person from obtaining equitable relief against fraud, in such cases, the court will scrutinize the conduct of the opposing party, and if it finds that party has been guilty of fraud in obtaining the judgement, it will deprive that party of the benefit of it. *Johnson v. Waters*, 111 U.S. 640, 667 (1884); quoted and followed in *Moore v. Sievers*, 336 Ill. 316, 322, 168 N.E. 259 (Illinois Supreme Court 1929).

249.    Fraud upon the court is that species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication. *Kenner v. C.I.R.* 387 F. 2d 689, 691 (7th Cir. 1968).

250.    If courts are to require others to follow its rules and procedures, courts must do so as well; a court cannot treat a case differently than others. *Hollingsworth v. Perry*, 558 U.S. 183, 199 (2010).

251.    Court orders must be obeyed:  "An order is an order" *A. F. Moore & Associates Inc.* 974 F. 3d at 840-841.

252.    As described in this Complaint, Defendants, Pallmeyer, Barret, Brennan and Easterbrook defiled the court itself through their fraudulent acts, omissions, and statements to disobey the court's rules and procedures causing Foster's case to be treated differently than others.

253.    As described in this Complaint, Defendants, Pallmeyer, Barrett, Brennan and Easterbrook through their fraudulent acts, omissions and statements defiled the court itself by committing contempt of court each and every time they disobeyed the Foster I court order mandate.

254.    As described in this Complaint, Becker, Porter, Pallmeyer, Barrett, Brennan and Easterbrook, as officers of the court, through their fraudulent acts, omissions, and statements to the court disobeyed the court's rules and procedures, which in turn prevented the judicial machinery of the court from performing in the usual manner its impartial task of adjudicating cases that are presented for adjudication.

255.    As described in this Complaint, Becker, Porter, Pallmeyer, Barrett, Brennan and Easterbrook, as officers of the court, through their fraudulent acts, omissions, and statements, repeatedly disobeyed the Foster I court order mandate committing contempt of court that prevented the judicial machinery of the court from performing in the usual manner its impartial task of adjudicating cases that are presented for adjudication.

256.    As described in this Complaint, Becker and Porter as officers of the court made false statements of fact to the court that prevented the judicial machinery of the court from performing in the usual manner its impartial task of adjudicating cases that are presented for adjudication.

257. Pallmeyer, Barrett, Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by accepting, adopting and restating to the court Becker and Porter's false statements of fact as the facts of the case, instead of the facts established by the evidence on the record.

258. As described in this Complaint, Becker and Porter as officers of the court, made misrepresentations of law to the court that prevented the judicial machinery of the court from performing in the usual manner its impartial task of adjudicating cases that are presented for adjudication.

259. Pallmeyer, Barrett, Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by accepting, adopting and restating to the court Becker and Porter's misrepresentations of law instead of the law of the case established under Foster I and other law applicable to this case.

260. As described in this Complaint, Pallmeyer, Barrett, Brennan and Easterbrook as officers of the court made false statements of fact and law to the court that prevented the judicial machinery of the court from performing in the usual manner its impartial task of adjudicating cases that are presented for adjudication.

261. As described in this Complaint, Becker, Porter, Pallmeyer, Barrett, Brennan and Easterbrook as officers of the court fraudulently suppressed and rejected evidence on the record that prevented the judicial machinery of the court from performing in the usual manner its impartial task of adjudicating cases that are presented for adjudication.

262. Becker and Porter as officers of the court interfered with the judicial machinery of the court by misrepresenting to the court that the settlement agreement between Foster and Pace

was admissible into evidence when the rules of evidence, a Congressional statute [28 U.S.C. 652(d)], and public policy prohibit its admission into evidence.

263.    Pallmeyer as an officer of the court interfered with the judicial machinery of the court by misrepresenting to the court that the settlement agreement was admissible into evidence and then allowed the settlement agreement into evidence in violation of the rules of evidence, a Congressional statute [28 U.S.C. 652(d)], and public policy.

264.    Barrett, Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by falsely stating to the court that Foster put the settlement agreement at issue.

265.    Barrett, Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by misrepresenting to the court that the settlement agreement was admissible into evidence and then allowed the settlement agreement into evidence in violation of the rules of evidence, a Congressional statute [28 U.S.C. 652(d)], and public policy.

266.    Barrett Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by acting as witnesses to render false hearsay testimony against Foster on a material disputed fact.

267.    Barrett Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by making findings of fact based on their own false hearsay testimony to the court.

268.    When Becker filed the motion to dismiss the Rule 60(b)(4) appeal, as an officer of the court, he falsely represented to the 7th Circuit court of Appeals that Principal can act in the capacity as both the Appellant and Appellee preventing the court from performing in the usual manner its impartial task of adjudicating cases on appeal.

269. Becker as an officer of the court perpetrated fraud upon the court by filing a motion to suspend the filing of briefs to block the 7th Circuit Court of Appeals from performing in the usual manner its impartial task of adjudicating cases on appeal.

270. On remand, Pallmeyer, Barrett, Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by misrepresenting to the court that they had jurisdiction to reinstate a vacated judgement and then entered or affirmed that vacated judgement without jurisdiction.

271. Barrett Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by misrepresenting to the court that they had jurisdiction and then granted Principal's motion to dismiss the appeal of Foster's Rule 60(b)(4) motion without jurisdiction.

272. Barrett Brennan and Easterbrook as officers of the court interfered with the judicial machinery of the court by misrepresenting to the court that they had jurisdiction and then denied Foster's mandamus petition without jurisdiction.

273. As described throughout this Complaint, Defendants, Pallmeyer, Barrett, Brennan and Easterbrook through their fraudulent acts, omissions and statements caused violations of the judicial machinery of the court established under the United States Constitution that guarantees the right to due process of law and other rights enumerated therein: such violations include disobeying the court order mandate in Foster I; denying the fundamental right to res judicata; entering judgements against Foster based solely on false statements of fact made by officers of the court instead of the evidence on the record; misrepresenting to the court that they have jurisdiction and then entering and affirming judgements against Foster without jurisdiction; misrepresenting to the court that they have jurisdiction and then denying Foster's mandamus petition without jurisdiction; misrepresenting that the settlement documents are admissible into evidence by

disobeying the rules of evidence, and violating statutory and public policy directives on the admission of settlement agreements into evidence; disobeying procedures including summary judgement procedure and Appellate Operating Procedure 6 on panel assignments; denying a right to a trial by jury which would have determined the truth from the evidence on the record instead of a decision based on the false statements of fact and false hearsay testimony made by officers of the court; denying Foster a right to appeal the district court's denial of his Rule 60(b)(4) motion in accordance with appellate rules and procedures; denying the right of free speech to address grievances by threatening Foster with sanctions; denying a right to a fair and impartial tribunal; and denying the right to have a reason for the judgement based on the evidence on the record.

274.    Those that urge fraud on the court and prevail are in no position to dispute its effectiveness. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 247 (1944)

275.    A judgement procured by fraud on the court is no judgement at all and never becomes final. *Kenner v. C.I.R.*, 387 F. 2d 689, 691 (1968).

276.    Foster respectfully requests that this court set aside the district court judgement entered against Foster on remand as affirmed in Foster II, assess sanctions against the Defendants, and grant such other relief as the court deems just and proper.

## COUNT 2

## VIOLATION OF 42 U.S.C. § 1983 – CONSPIRACY

As to all Defendants, Plaintiff alleges as follows:

277.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

278.    A federal judge sitting in a diversity action is a state actor.

279.    Defendants expressly and/or impliedly agreed or reached an understanding with Pallmeyer, Barrett, Brennan and Easterbrook to deprive Plaintiff of his constitutional rights in violation of the Fourteenth Amendment of the United States Constitution.

280.    In furtherance of this conspiracy, Defendants committed overt and unlawful acts as described in this Complaint in concert with Pallmeyer, Barrett, Brennan and Easterbrook who were acting under color of state law.

281.    As a direct and proximate result of such violations, Plaintiff has suffered actual damages.

282.    Defendants' actions were undertaken with a reckless indifference to Plaintiff's rights.

283.    Defendants actions were intentional, willful, wanton, and malicious.

## COUNT 3

## VIOLATION OF FIFTH AMENDMENT – CONSPIRACY

As to all Defendants, Plaintiff alleges as follows:

284.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

285.    Pallmeyer, Barret, Brennan and Easterbrook were federal employees at the time of the actions complained of in this Complaint.

286.    Defendants expressly and/or impliedly agreed or reached an understanding with Pallmeyer, Barrett, Brennan and Easterbrook to deprive Plaintiff of his constitutional right to due process of law in violation of the Fifth Amendment of the United States Constitution.

287.    In furtherance of this conspiracy, Defendants committed overt and unlawful acts as described in this Complaint in concert with federal employees Pallmeyer, Barrett, Brennan and Easterbrook.

288.     As a direct and proximate result of such violations, Plaintiff has suffered actual damages.

289.     Defendants' actions were undertaken with a reckless indifference to Plaintiff's rights.

290.     Defendants actions were intentional, willful, wanton, and malicious.

WHEREFORE, Plaintiff respectfully requests the entry of judgement in his favor against Defendants on Counts 2 and 3 as follows:

(a)     an award of actual damages, including, but not limited to lost future income damages adjusted for higher tax rates in excess of one million dollars;

(b)     an award of punitive damages;

(c)     an award of attorney fees;

(d)     such other relief as this court may deem just and proper.

/s/ Francis T. Foster
Francis T. Foster
**Attorney for Plaintiff**

Francis T. Foster (ARDC No 0852945)
4307 Eberly Avenue
Brookfield, Illinois 60513
708-751-3505
fostman@prodigy.net

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

/s/ Francis T. Foster
Francis T. Foster
Attorney for Plaintiff

# EXHIBIT A

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## LIMITED REMAND ORDER

March 25, 2020

Before

DANIEL A. MANION, *Circuit Judge*
MICHAEL B. BRENNAN, *Circuit Judge*
MICHAEL Y. SCUDDER, *Circuit Judge*

| No. 19-3139 | UNITED STATES OF AMERICA, Plaintiff - Appellee |
| --- | --- |
| | v. |
| | BRYAN OSBORNE, Defendant - Appellant |

| **Originating Case Information:** |
| --- |
| District Court No: 1:17-cr-00073-1 |
| Northern District of Illinois, Eastern Division |
| District Judge Sara L. Ellis |

Upon consideration of the **JOINT MOTION TO REMAND**, filed on March 23, 2020, by counsel for the parties,

**IT IS ORDERED** that the motion is **GRANTED**. This appeal is **REMANDED** to the district court for further proceedings consistent with the position of the parties.

form name: **c7_Order_3J**(form ID: 177)

# EXHIBIT B

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## ORDER

May 29, 2020

Before

FRANK H. EASTERBROOK, *Circuit Judge*
DIANE S. SYKES, *Circuit Judge*
AMY J. ST. EVE, *Circuit Judge*

| | |
|---|---|
| No. 19-2256 | UNITED STATES OF AMERICA,<br>Plaintiff - Appellee<br><br>v.<br><br>CHRISTOPHER DAVIS,<br>Defendant - Appellant |

| Originating Case Information: |
|---|
| District Court No: 1:17-cr-00062-RLY-DML-2<br>Southern District of Indiana, Indianapolis Division<br>District Judge Richard L. Young |

Upon consideration of the **JOINT MOTION TO REMAND**, filed on May 27, 2020, by counsel for the parties,

**IT IS ORDERED** that the motion is **GRANTED**. The restitution judgment is **VACATED** and this case is **REMANDED** to the district court for reconsideration in light of the position jointly asserted by the parties.

form name: **c7_Order_3J**(form ID: 177)